Hermond **RAGLAND**, Plaintiff–Appellee,

v.

The **SHATTUCK NATIONAL BANK,** Defendant–Appellant,

and

**Triple Sons Ranch, Inc., d/b/a Triple Sons Shattuck Farms; and Peter R. Ferguson, Defendants.**

No. 93–6270.

United States Court of Appeals, Tenth Circuit.

Sept. 28, 1994.

984

Collier H. Pate, Pate & Payne, Oklahoma City, OK (Stuart A. Knarr, also of Pate & Payne, and M. Cecil Klem, Klem & Klem, Shattuck, OK, with him on the brief), for appellant, The Shattuck Nat. Bank.

Donald L. Kahl (Elaine R. Turner, with him on the brief), both of Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, OK, for appellee, Hermond Ragland.

Before LOGAN and McWILLIAMS, Circuit Judges, and BROWN, Senior District Judge.*

WESLEY E. BROWN, Senior District Judge.

In this action, the defendant Shattuck National Bank (hereinafter referred to as the "Bank") appeals a jury verdict in favor of the

* The Honorable Wesley E. Brown, United States District Senior Judge for the District of Kansas, sitting by designation.

plaintiff, Hermond Ragland. The jury found that defendant was liable for fraud and negligent misrepresentation and awarded plaintiff actual damages of $710,782.13.

The Bank appeals, claiming that plaintiff Ragland was not the real party in interest, that the evidence was insufficient to support the jury's finding of fraud and negligent misrepresentation, or the damages awarded, and that certain evidence was improperly admitted.

Our review of the record discloses that Ragland, a resident of Cimmaron, Kansas, and St. Jon, New Mexico, was in the business of buying and harvesting alfalfa hay from Kansas farmers, and then reselling it to dairy operations around Stephenville and Dublin, Texas.

In early 1991, Ragland entered into negotiations with Peter R. Ferguson and his wholly owned company, Triple Sons Ranch, Inc., to supply Triple Sons with one million dollars worth of alfalfa hay to be used in the Triple Sons' alfalfa processing plant in Shattuck, Oklahoma.[1] When plaintiff Ragland asked Ferguson about his financial ability to perform the contract, Ferguson directed him to his banker, J. Michael Stuart, the president of the Shattuck Bank. Plaintiff presented evidence that the Bank, through its president Stuart, falsely assured Ragland that Ferguson and his company were "good customers" of the Bank, and that the Bank possessed an "irrevocable letter of credit" that would provide funding for Ferguson's processing plant.

Contrary to the Bank's contention, we find that the evidence presented by plaintiff fully supports the jury verdict in this case. A summary of such evidence establishes that in May, 1990, the Bank initially loaned Ferguson $85,000 to make a down payment on the purchase of the processing plant in Shattuck, and that although this loan was not paid when due, the Bank ultimately rolled this note into an $800,000 credit line granted by the Bank to Ferguson and his company on July 23, 1990.[2]

There is no question that these were "bad loans." Both were based upon questionable financial statements presented by Ferguson and his wife. In the first financial statement given on April 18, 1990, Ferguson claimed a net worth of over $17 million, but listed only $1,000 cash and $1,200 in government bonds. His claim of $13 million in accounts receivable called for a careful credit check. In a second financial statement dated May 8, 1990, Ferguson claimed only a net worth of $333,000, but listed ownership of a home in Nice, France, that seemed to be held by an educational foundation. There was also an indication of problems with the IRS. Again, these factors called for a careful credit check by a banker.

Mrs. Virginia Ferguson also submitted a financial statement dated May 8, 1990, claiming ownership of an insurance settlement valued at $300,000 and title to real estate in the Sea of Cortez in Mexico and Baja California.

In making these two loans, the Bank waived credit reports, and lien searches, made no investigation into Ferguson's IRS problems, and made no effort to check accounts receivable or real estate allegedly owned by the Fergusons. The collateral listed to secure the $85,000 loan was the $300,-

---

1. Ferguson was operating the plant to process hay into animal food pellets or cubes for resale to such companies as Farmland Industries and the Purina Company.

 Plaintiff Ragland obtained a default judgment on his claims against Ferguson and Triple Sons Ranch, Inc., and they are non-appealing defendants in this action. Triple Sons Ranch, Inc., owned by Peter Ferguson and his wife, was doing business as Triple Sons Shattuck Farms. All references to "Ferguson" herein include the corporate defendant.

2. The initial funding on the loan was $705,000 and the Bank's lending limit at that time was $740,000. At a later time, bank examiners made some adjustments and the bank's lending limit dropped below $705,000. At some later time, the discrepancies were worked out and none of the Bank's directors were held personally liable for the Ferguson loan.

 The "top dollar draw-out" on this $800,000 line of credit was $735,000, which included the original $80,000 loan. For convenience sake, we will continue to refer to this credit extension as the "$800,000 loan."

 A stipulation of facts contained in the pretrial order, which recited the circumstances of these loans, and the extent of the Bank's information concerning Ferguson's financial situation, was read and presented to the jury. R. 248–249.

000 insurance settlement reported by Mrs. Ferguson, although the Bank determined that this settlement was without value. The collateral listed to secure the $800,000 loan included all assets and accounts receivable of the Shattuck Farms operation, an assignment of a one-year purchase contract with Farmland Industries, and a $500,000 certificate of deposit which was supposed to be delivered to the Bank by Ferguson or some member of his family. In fact, this certificate of deposit was never obtained or delivered to the Bank.

From the outset, it appears that the loans to Ferguson were of concern to the Bank, which always considered the loans to be "interim financing." The Bank attempted to get participation agreements from other financial institutions to share the risk, but other banks declined to do so without appropriate credit checks, or evidence of an equity interest on the part of Ferguson.

Ferguson, on his own behalf, attempted to get permanent financing from various sources in California and Nevada, and was in fact successful in obtaining two or three "Letters of Commitment," at least one designated as an "Irrevocable Letter of Commitment." None of these were "Letters of Credit," unconditional promises to commit money to Ferguson's undertakings and were, at most, merely promises to commit, subject to various conditions, and subject to limited time periods. While the commitment letters were delivered to the Bank, none of these sources ever paid any funds into the Bank to Ferguson's credit and they were, in essence, worthless.[3]

The $800,000 loan actually went into default in September 1990, only two months after the loan was disbursed. In an internal review of the loan made by the Bank on September 26, 1990, the reviewer stated: "I don't feel good about this line." While Ferguson was to make monthly payments of $13,041 on the account, only a few payments were made, and the last payment on this loan was $5,750 paid December 28, 1990.

Plaintiff presented evidence that by early 1991 the Bank knew that Ferguson had a negative net worth, and that it faced a tremendous loss on the credit which had been extended. Ferguson continued to write insufficient fund checks, and it appears that the Bank returned over 150 of them for lack of funds. Dr. Swearingen, a banking expert, testified that he had never seen so many checks returned on one customer, and that it was imprudent for the Bank to allow Ferguson to continue to write checks because suppliers were thinking they were getting paid when in fact they were not.[4]

On December 11, 1990, Mr. Schultz, an independent outside banker who reviewed the Bank's records, classified the entire Ferguson loan as substandard, found that Triple Sons had a negative net worth of over $130,000, and a recommendation was made that no overdrafts should be paid because of fear of violating the Bank's legal lending limits.

In early January, 1991, the Bank became aware that the FBI was investigating Ferguson, learning that he was the subject of a federal grand jury inquiry when the Bank was served with a subpoena. On January 17,

---

**3.** Plaintiff's Exhibit 37, Appellee's Supplemental Appendix p. 34, is a "Letter of Commitment" dated January 18, 1991, stating that Erin Holdings International, Inc., had approved an undertaking of $2,611,114.00 to be deposited "no sooner than January 25, 1991," but subject to receipt of a Joint Venture Agreement, financial information and an on-site inspection, the commitment to expire after January 30, 1991.

Plaintiff's Exhibit 46 (Supplemental Appendix p. 43) is a letter dated March 27, 1991, from "Universal Financial Service" of Las Vegas, Nevada, undertaking "to commit" a certificate of deposit for $4.5 million to be placed in escrow to fund Ferguson's project. The undertaking was dependent upon receipt by Universal of $45,000, and the commitment would "automatically ex-

pire in 60 banking days from date of issue" and the commitment "will automatically expire in 5 banking days if not accepted and returned to our office." The Bank refused to lend Ferguson an additional $45,000 "processing fee" for this letter, but Ferguson did convince another customer of the Bank to borrow the $45,000, which was sent to Universal Finance. No deposit was ever made by Universal.

**4.** From November, 1990, through April, 1991, 141 bad checks were returned by the Bank. Plaintiff's Exhibit 142, Supplemental Appendix p. 283. In April, 1991, when James Stuart, the president of the Bank learned that Ferguson was "kiting" checks, he unsuccessfully attempted to confiscate Ferguson's checkbook. R. 488.

1991, in compliance with the subpoena, the Bank turned over its Ferguson loan files to the FBI.

In early 1991, several lawsuits were filed against Ferguson and the Bank by unpaid suppliers and parties who had received bad checks from Triple Sons. The banking expert testified that when a bank is named as a defendant in such suits, it should be a cause of great concern about the exposure of the bank as well as the viability of the customer.[5] From these suits and other materials which came to its attention, the Bank knew that in addition to the debt due the Bank, Ferguson owed another $300,000 in trade debt that was in default or delinquent.[6]

By March, 1991, the Bank had charged off part of the Ferguson loan as a loss and placed it on a "non-accrual status." From internal Bank records received in evidence, the jury was entitled to find that by early April, the Bank had determined to foreclose on the loan and loan documents were gathered and forwarded to the Bank's attorney for the purpose of this legal action.

The foreclosure suit was actually filed on May 3, 1991. On the morning of that day, Stuart contacted Ferguson and told him that he would be served with papers that afternoon. When the foreclosure papers were served in the afternoon, the sheriff also arrested Ferguson and his wife on criminal charges of dishonesty in a trust relationship.[7]

In August, 1991, judgment was entered in the foreclosure suit, and the Bank recovered all of the assets of the Fergusons and their company which were of the value of around $150,000 to $200,000. Since the Fergusons owed about $720,000, the total loss sustained by the Bank was $650,000.

Plaintiff Ragland first sold two truckloads of hay to Ferguson on January 15, 1991, after he learned that Ferguson would buy low quality hay. Ragland had a supply of this type of hay which had been rain damaged in New Mexico, and he could not have sold this hay to his regular dairy customers.[8] He delivered similar loads of hay to Ferguson on January 23, January 31, and on April 15, 1991. Initially, Ragland did not make any financial inquiries about Ferguson, and the checks he received for the first two loads cleared the Bank. Some of the later checks Ragland received from Ferguson for hay were returned for insufficient funds, but later cleared the Bank, or Ferguson replaced them with cashier's checks. At the time Ragland delivered his last load of hay in April, 1991, he believed that he had been fully paid for all of the hay delivered.

In March or April, 1991, Ferguson and Ragland discussed a long-term arrangement for the 1991 hay season which was coming up. Since Ferguson agreed to take 15% protein hay, which was not dairy quality and did not require a low moisture content, this meant the hay could grow longer in the field, and Ragland could get more tonnage per acre than he could for dairy quality hay, which required an early cutting and harvesting at night. Ragland was told that Ferguson could handle 1,000 tons per day through his plant. Ragland agreed to supply about 200 tons of this per day, an amount which would total around 21,000 tons for the season for over a million dollars. This was the total supply of hay that was available to Ragland, and delivery to Ferguson meant that Rag-

---

5. Ferguson and the Bank were sued on February 15, 1991, by David Woods to recover $54,000 for hay sold and delivered to Ferguson. On March 20, and April 19, 1991, two other suits were filed. It appears that the Bank was later dismissed as a defendant in these suits.

6. On November 13, 1990, a demand for payment of the original promissory note signed by Ferguson to purchase the Shattuck operation was made in the sum of $235,264.12 plus interest.

Michael Stake, Ferguson's attorney, testified that on January 15, 1991, he sent the Bank a letter setting out the names of Ferguson's credi-

tors, showing that there was approximately $300,000 in trade debt past due.

7. The Fergusons had withheld money from employee wages to pay health insurance premiums, but had failed to pay those premiums. As a result, the employees lost their health insurance, and complaint had been made to the county attorney. Both Ferguson and his wife were arrested in the afternoon of May 3rd at the time the foreclosure papers were served. Charges against Mrs. Ferguson were later dropped.

8. Dairy quality hay has a high protein component, with a very low moisture content.

land would have to give up his Texas dairy buyers and purchase additional equipment to supply Ferguson's requirements. When Ragland inquired how he would be paid for the hay, Ferguson stated he had an irrevocable letter of credit at the Bank and referred him to J. Michael Stuart for information about it.

Ragland testified that when he went to see Stuart about this in April, 1991, he told Stuart he was thinking of entering into a long-term contract with Ferguson, and that Stuart told him he had an irrevocable letter of credit in his files from California, and Ferguson would have in excess of $3 million coming in which would cover hay suppliers. Ragland was told he could either bring checks in or bring in weight tickets, and he would be paid. Stuart told Ragland and his son that Ferguson was a good customer and that his "money was good." Sometime after this, and just prior to May 3, 1991, Ragland again went in to see Stuart and told him that he was going to make a contract with Ferguson and that he would be bringing in eight loads of hay per day. Stuart told him that the money had not come in yet, so not to start hauling right away, but when the hay was ready, in a week or 10 days, it would be all right to start deliveries.[9]

The contract between Ferguson and Ragland, dated May 1, 1991, was actually signed in the morning of May 3rd, only a few hours before Ferguson was arrested, the foreclosure papers were served, and the plant operations were taken over by the sheriff. It appears that Ragland was not aware of any of these circumstances. He just went home and started cutting hay about the end of the first week in May to fulfill his contract with Ferguson.

Around May 6, Ragland discovered that the last check Ferguson had given him in the amount of $8,700 as payment for hay had been returned by the Bank. Ragland went into the Bank to see Stuart about this check around May 8 or 9. Stuart told Ragland "not to worry"—that the letter of credit would cover it when the money came in. Stuart did not tell Ragland that the Bank had foreclosed on Triple Sons, and had recovered all of its assets.

Ragland testified that from May to September, he talked to Stuart frequently about this check—almost weekly, and Stuart knew that Ragland was out with his crews cutting hay for the Ferguson contract.[10] Stuart continued to reassure Ragland that the letter of credit would take care of the contract, even when Ragland finally learned that the Bank had foreclosed on the assets, and that Ferguson had been arrested.

When Ragland finally realized that there was no letter of credit and that what he had been told by the Bank was not true, he stopped putting up hay for Ferguson and tried to get his dairy customers back. At that time he had put up more than 5,000 tons of hay which could not be sold to dairies and had to be left in the fields.[11]

It was stipulated, and the evidence clearly establishes that the Bank did not disclose to Ragland that the Bank had previously funded a loan to Ferguson and his company of $800,000, that the Bank had a security interest in all of Ferguson's property and cash; that the Bank had a significant economic interest in the continuation of Ferguson's business; that

---

9. While Stuart denied that he told Ragland or any other hay supplier that there was an irrevocable letter of credit to cover hay deliveries, plaintiff placed in evidence a FAX transmittal to David Woods, a hay vendor, which stated in pertinent part:

> David, details have been worked out. However, the finalized irrevocable letter of credit needs to be revised and will be done this afternoon. Will not be able to FAX copy of this final document until tomorrow.... (Ex. 38, R. 673)

10. Ragland's son, who was present during several meetings with Stuart, testified that the banker

referred to a "letter of credit," and that during a meeting the first part of June, 1991, Stuart told them there was some problem about the paperwork, but the money would be there, "any day," and that during a later meeting in August, while they were still cutting hay for Ferguson, Stuart again assured them that the money would be there and that the letter of credit was good. When the Raglands asked to see the letter, they were told that it was confidential.

11. Under his contractual arrangements with the farmers who owned the hay, any hay left in the field at the end of the season became the property of the landowners.

the Triple Sons' loan was in default and that the Bank intended to file a foreclosure action against Ferguson and his company; that the Bank had dishonored many checks given by Ferguson in payment to hay suppliers; that Ferguson, his company, and the Bank had been named as defendants in several lawsuits arising from the Bank's dishonoring of checks; and that Triple Sons and Ferguson had never obtained any funding on any letter of credit relating to the contract between Triple Sons and Ragland.

Ragland testified, and the jury was entitled to find, that had Ragland known the true financial state of Ferguson and his company, Ragland would never have entered into a contract with Ferguson, and that he would have continued to put up dairy quality hay for his regular customers as he had done in the past.

Plaintiff's banking expert reviewed the Bank's records and testified that Ferguson had authorized the Bank to release to Ragland, the financial information that it had about him and Triple Sons' financial status, and that when such permission is given, the Bank had the duty and responsibility of discussing both good and bad information, "the whole truth and nothing but the truth." R. p. 257. Under the evidence, the Bank was obliged to give its valid opinion as to the credit worthiness of its customer and to disclose any adverse information that it had. Given the fact that the Bank knew the Ferguson loans were in default, that there was another $300,000 in trade debt that was in default, that there were over 100 insufficient fund checks on their accounts, that the FBI and federal grand jury were investigating the Fergusons, that the Bank had been sued, along with its customer, for not paying the customer's debts, that there were other lawsuits being filed by hay vendors and suppliers, and that the county attorney was contemplating or had filed bogus check charges,

it would not have been proper for the Bank to inform inquirers that Ferguson was a good customer of the Bank.

Under the evidence, the jury could find that the Bank intended to conceal the true financial situation of Ferguson and his company in order to maintain the operations of Triple Sons as long as possible so that the Bank might secure some repayment of the advances it had made to the company. In addition it is clear that the Bank, by concealing the true state of affairs, was able to gain an advantage over other creditors by foreclosure on all of the assets of Ferguson and his company.

Ragland testified that the actual loss he sustained because of the Bank's fraud and negligent misrepresentation totalled $710,782.13, and this was the exact sum awarded by the jury.[12] This loss included the bad check ($8,752.36, plus interest of $1,141.97 on that sum); Ragland's out-of-pocket expenses in putting up hay for Ferguson, $45,000 (preparation of 5,000 tons of hay for delivery at $9 per ton), operating expenses of $8,595.60 (equipment rental, repair, travel, lodging and food for workers), lost sales to dairy farms of $644,000 (70 workdays × 200 tons per day = 14,000 tons at $46.00 per ton profit),[13] and additional interest payments he had to make on his Bank loans of $3,292.20. (Pl.Ex. 111, R. 182)[14] The Bank contends that the entity Ragland and Sons, Inc., an inactive corporation formed by Ragland in 1990, and not Ragland himself was the real party in interest in this action. At the conclusion of the evidence, the district court found that there had been no evidence submitted to refute Ragland's claim that he, and not the corporation, was the real party in interest.

At trial, Ragland testified that "Ragland and Sons" was a personal trade name which he had used in business for a number of years. Although a Bank account was

**12.** After this verdict was returned, additional evidence was presented on plaintiff's claim for punitive damages, but the jury returned a verdict in favor of the Bank on that claim.

**13.** Plaintiff presented evidence from buyers of dairy quality hay. One testified that he would have bought up to 5,000 tons more from Ragland

in 1991, while the other testified that he would have bought up to 10,000 tons more had Ragland had dairy quality hay available that year.

**14.** Documentary evidence and the testimony of Ragland's suppliers and customers supported these figures.

opened in the corporate name, Ragland had always used it as his personal account. Ragland dealt with the Bank and Ferguson only as an individual, and the losses he sustained were his own personal losses.[15] All of the evidence presented supported the claim that Ragland had never conducted business through the corporate entity, had never earned any income and had never owned any property in the corporate name. Under these undisputed facts, Ragland was the real party in interest to pursue his claim against the Bank.

■ In this appeal, the Bank contends that the trial court, over its objections, improperly admitted evidence relating to the circumstances of the loans it made to Ferguson and his company since these loans, made sometime before Ragland came into the picture, were only "marginally relevant" and the evidence concerning them presented by plaintiff's banking expert only served to prejudice the jury against the Bank. As noted by the defendant, the standard of review relating to the admissibility of evidence is abuse of discretion. *Bennett v. Longacre*, 774 F.2d 1024, 1027 (10th Cir.1985). Our review discloses no such abuse. The history of the Bank's experience with Ferguson and his company was entirely relevant to the jury's consideration of whether the Bank had knowingly made fraudulent misrepresentations or omissions of material fact in providing information to Ragland when he inquired about Ferguson's credit standing.

■ Our review of the record has established that the evidence fully supports the jury finding that the Bank committed both fraud and negligent misrepresentation in supplying credit information to Ragland about its customer. Under Oklahoma law, the term "fraud" is broadly defined to include any act designed to gain an unfair advantage over another. In *Spartan Petroleum Corp. v. Curt Brown Drilling Co.*, 446 P.2d 808, 813 (Okl.1968), the court quoted the rule stated in *Stapleton v. Holt*, 207 Okl. 443, 250 P.2d 451, 453–454 (1952):

Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, as it includes all surprise, trick cunning, dissembling, and any unfair way by which another is cheated.

■ Oklahoma law recognizes that fraud can be either actual or constructive:

To constitute actual fraud there must be an intentional deception. On the other hand, constructive fraud does not require intent to deceive. Liability for constructive fraud may be based on a negligent misrepresentation. Even an *innocent misrepresentation* may constitute constructive fraud where there is an underlying right to be correctly informed of the facts. (*Faulkenberry v. Kansas City Southern Ry. Co.*, 602 P.2d 203, f.n. 6, p. 206, (Okl.1979), *cert. den.* 464 U.S. 850, 104 S.Ct. 159, 78 L.Ed.2d 146) (emphasis of the court).

See also *Gentry v. American Motorist Insurance Co.*, 867 P.2d 468, 471 (Okl.1994)

■ In *Barrett v. Tallon*, 30 F.3d 1296 (10th Cir.1994), plaintiffs claimed in part that in turning over their cattle to an Oklahoma concern under a grazing contract, they relied upon the assurances of the president of an Oklahoma bank officer that the bank "fully backed the plaintiffs' grazing contracts with Fox and Bradshaw," and that the bank president "knew Fox and Bradshaw to be trustworthy and creditworthy." We noted there that under Oklahoma law, a fraud claim requires proof of these elements: a material misrepresentation, knowingly or recklessly made, with intent that it be relied upon, and actual reliance by another to his detriment, and that plaintiffs had stated a claim of fraud against the bank with sufficient particularity to avoid dismissal of their claims. See also

---

**15.** The "weigh tickets" Ragland received upon delivery of hay described "Ragland & Sons" as the seller, not Ragland & Sons, Inc.; checks paid to Ragland were payable to "Ragland & Sons," and the hay contract entered into with Triple Sons was in the trade name "Ragland & Sons."

*Shamrock Drilling Fluids, Inc. v. Miller*, 32 F.3d 455 (10th Cir.1994).[16]

 Under Oklahoma law, fraud may occur when one volunteers to speak and provides information to influence another but fails to disclose the whole truth. Thus in *Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350, 1353–1354 (Okl.1988), the court noted:

> Although a party may keep absolute silence and violate no rule of equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to disclose the whole truth.

 The Bank's contention that Ragland could not reasonably have relied on the Bank's statements is without merit. Ragland was specifically directed to the Bank's president to obtain financial information about one of its customers. Since the Bank possessed superior information regarding its customer, the jury could find that it was reasonable for Ragland to believe and rely on the information he received from the president of the Bank. The Bank argues that Ragland could not have relied on the information he received from the Bank since he had received insufficient fund checks from Ferguson, he was told that his contract with Triple Sons was "subject to final funding," and that Ragland knew Ferguson had been arrested and released.

The jury heard evidence that in the hay business, the mere receipt of insufficient-fund checks is not in itself cause for alarm, and Ragland testified that on the date he entered into the contract with Triple Sons, he believed that he had been fully paid for all outstanding checks.[17] Any concern about that final check, and the "receipt of final funding" was met by evidence of the continued assurances of the Bank that there was an irrevocable letter of credit on hand, that funds would soon be forthcoming, and that Ferguson's arrest would have no effect on Triple Sons' operations because the funding under the letter of credit was imminent.[18]

The jury chose to believe Ragland's evidence in this regard, and its determination of credibility may not be disregarded.

 In addition to finding for Ragland on the issue of fraud, the jury further determined that the Bank's actions constituted negligent misrepresentation. Under Oklahoma law, the elements of this claim were: a) a misrepresentation or omission of material fact; b) that the misrepresentation or omission was material; c) that in responding to a credit inquiry, the Bank failed to exercise the reasonable care required of competent bank officers; d) that the plaintiff reasonably relied on the Bank's misrepresentation or omission; and e) that the plaintiff sustained damage as a result of this reliance. See *MSA Tubular Products v. First Bank and Trust Co.*, 869 F.2d 1422 (10th Cir.1989).

 Contrary to the Bank's claim, the representations here were ones of fact and not representations of mere opinion or law. In the *MSA Tubular Products* case, a supplier inquired of the bank concerning the credit status of a depositor before agreeing to sell pipe to the depositor on open account. The trial court determined that the bank did not have a fiduciary relationship with the supplier and therefore owed no duty to that company to disclose information about its depositor, absent a specific request for a credit report. This court reversed, finding that once the bank undertook to respond to the inquiry, it had a duty to disclose accurately, and that the bank could be held liable for giving misleading information if the supplier reasonably relied upon the statements of the bank.[19]

---

**16.** In the *Shamrock Drilling* case, the plaintiff testified that she spoke with a bank officer about defendant's trust account and was falsely assured that her money would be in "good hands." In presenting her claim for common law fraud based upon false representations, the jury was instructed that a false representation included "the omission or suppression of a fact by one who has a duty to disclose it."

**17.** It was stipulated by the parties that Ragland was not notified of the dishonor of Triple Sons' final check until after May 6, 1991.

**18.** Although the Bank denied that such statements were made, the jury was entitled to believe the testimony of plaintiff's witnesses.

**19.** The bank employee informed the supplier that there would be no problem with a check in the amount of $95,000 drawn on the depositor's ac-

In ... cases involving the duty to disclose, ... Oklahoma has followed the rule that one who has no duty to speak, but makes a disclosure nevertheless, undertakes to speak truthfully.... One who assumes to speak when under no duty to do so cannot suppress pertinent facts or state less than the whole truth ... This principle furthers the rule that a person without responsibility to another has the duty to either remain silent or to tell the truth ... The consequences of failing this duty is liability to the person who relied upon the statements made ... (Citations omitted). 869 F.2d at 1424.

■ While the Bank here contends that it had no duty to disclose information on its customer, the evidence included an express written authorization which was contained in the Bank's own loan documents, and this assertion is further refuted by testimony of the president of the Bank that Ferguson had told him to expect inquiries from suppliers, and that it was all right for Stuart to discuss Triple Sons' financial abilities.

■ We are also satisfied that the amount of damages awarded by the jury was within the evidence. That award was the exact amount calculated by Ragland, and his testimony was supported by documentary evidence and testimony of other witnesses, including a farmer who owned the hay cut by Ragland, and buyers of dairy grade alfalfa who testified to the market that was available to Ragland had he continued to cut dairy quality hay. The Bank presented no evidence contradicting Ragland's figures, and the trial court properly refused to order a remittitur or new trial upon the issue of damages.

Under the evidence reviewed above, the jury could properly find that the Bank violated its duty to fully and fairly disclose the adverse information it had on Ferguson and his company, and that the plaintiff Ragland relied on the assurances of the Bank, to his detriment. The district court's refusal to set aside the jury verdict or to order remittitur

or new trial was correct, and the judgment is AFFIRMED.

count. In fact, at the time the statement was made, the depositor had a history of overdrafts, and the depositor's daily balances were under $10,000 and were, at times, in negative numbers.