**In re Dennis Florian HERRIG, Debtor.**

**AT & T, Plaintiff,**

v.

**Dennis Florian HERRIG, Defendant.**

Bankruptcy No. 97–02974–M.
Adversary No. 97–0292–M.

United States Bankruptcy Court,
N.D. Oklahoma.

March 3, 1998.

J. Michael Morgan, Tulsa, OK, for Plaintiff.

Gary G. Grisso, Tulsa, OK, for Defendant.

### MEMORANDUM OPINION

TERRENCE L. MICHAEL, Bankruptcy Judge.

THIS MATTER came before the Court for trial on January 15, 1998. Plaintiff AT & T appeared by and through its attorney, Michael Morgan. Defendant Dennis Florian Herrig ("Debtor" or "Herrig") appeared by and through his attorney, Gary G. Grisso. The Court received evidence and heard argument from the parties. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

### Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b).[1] Reference to the Court of this contested matter is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I).

### Findings of Fact

This action arises out of the alleged fraudulent use of a credit card. In August of 1993, Herrig received a solicitation from AT & T indicating that Herrig was "pre-approved" to receive an AT & T Universal MasterCard (the "Card") with a "pre-approved credit line" of $4,000.00. Herrig signed the form requesting the Card on August 17, 1993. AT & T issued the Card to Herrig in December of 1993 with a $4,000.00 credit limit.

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (West 1998).

AT & T presented detailed evidence regarding their selection process for cardholders such as Herrig. A list of potential credit card customers is prepared by a private credit service which contracts with AT & T for this purpose. That list is screened by the private credit service, apparently using available credit reports, to determine the suitability of the potential customer, i.e., whether that potential customer currently holds an AT & T credit card, and whether that potential customer is an appropriate credit risk. In considering the application, the credit agency retained by AT & T undertakes a detailed "scoring process." The agency reviews a particular potential borrower's credit history, history of past due accounts, and whether any of the individual's accounts have been canceled or otherwise adversely terminated. Based upon that review, the credit agency determines that particular individual's "score." No direct input is sought or received from the potential borrower during their scoring process. The range of credit scores is between 0 and 900.

Once AT & T receives the list with credit scores from the credit agency, the list is compared with lists of current AT & T cardholders and of individuals previously determined by AT & T to be unacceptable credit risks. All duplicate names are removed from the list. In order to be "pre-approved" for receipt of a card, AT & T requires a potential borrower to have a minimum credit score of 680. In addition to determination of eligibility, AT & T uses the credit score to determine the amount of "pre-approved" credit. Once the screening process is complete, AT & T sends a solicitation letter to those who qualify, indicating the amount of the pre-approved credit line. A representative of AT & T testified that, on average, AT & T receives a 2.3% response rate to solicitation.

In December of 1993, when his card was issued, Herrig had what AT & T described as an "excellent" credit score of 755. AT & T monitors the credit scores during the life of the account on a quarterly basis, so long as there is a balance on the account. With respect to Mr. Herrig, AT & T testified that there was no problem with his account or its balance until November of 1996. In November of 1996, Herrig obtained two cash advances on his AT & T account in the aggregate amount of $3,900.00, an amount just below his $4,000.00 limit. After obtaining these advances, Herrig made only one payment of $200.00 to AT & T.

Herrig admitted that gambling was at the root of his problem. During the time in question, Herrig incurred gambling debts in an aggregate amount in excess of $46,000.00, using primarily "bookies" located in Tulsa. Herrig also obtained several cash advances from creditors other than AT & T for the purpose of paying such debts. All or a substantial portion of the cash advances obtained from AT & T were used to pay these gambling debts. Herrig also indicated that he had borrowed from other sources, including his 401(k) retirement plan, in an effort to reduce his gambling debts. Herrig failed to list all of his gambling creditors on his petition and schedules, and he made payments to those creditors during the year prior to the filing of the bankruptcy case without disclosing the same in his statement of affairs.

AT & T made several attempts between March 4, 1997, and the filing of this bankruptcy case to communicate with Herrig regarding his delinquency. On several occasions, AT & T was unable to make contact with Herrig. On other occasions, Herrig told AT & T that payments had already been sent or that he was in the process of obtaining a "consolidation loan" to pay the amount due AT & T. Herrig also admitted that during this time period, he was "juggling" his various credit card accounts, using credit from one card to make the minimum payment required on another card. During this time, Herrig's "credit score" continued to decline to a low of 595 in April 1997. He promised several other payments until May 16, 1997, when AT & T received a check in an amount sufficient to pay the account in full. That check was returned not paid, with the notation "refer to maker."

With respect to the check issued to AT & T, the same was a "credit card check" issued by Chase Bank (hereafter "Chase"), a bank which had issued a credit card to Herrig. These "checks" are used to draw upon the line of credit in the same fashion as charging

the purchase of an item or obtaining a cash advance using the credit card. The credit limit on Herrig's Chase account was $1,300.00. Herrig received five such checks from Chase and used them all to pay off his credit card creditors. The aggregate amount of the checks written by Herrig totaled between twelve and sixteen thousand dollars, an amount several times in excess of his credit limit on the Chase card. None of the checks were honored. When questioned, Herrig indicated that it was his belief that Chase would not have sent him five checks if they intended to abide by their $1,300.00 credit limit, and that he believed that he could write the checks for whatever amount he deemed necessary in order to "consolidate his debts." The Court finds his testimony to be incredible.

Herrig's testimony at trial differed with his discovery responses in this action. In discovery, he indicated that his living expenses at the time of the cash advances were approximately $1,200.00 per month. At trial, Herrig testified that his expenses at the time of the cash advance were substantially the same as at the time of the filing of his bankruptcy case. Herrig's bankruptcy schedules show monthly expenses in the approximate amount of $2,632.00, an amount far in excess of the $1,200.00 figure. When pressed, Herrig admitted that his bankruptcy schedules, and not his answers to interrogatories, were accurate. Herrig also admitted that he had failed to provide AT & T with certain financial documents respecting the amount of payments he had made and his efforts to obtain the alleged "consolidation loan." Herrig testified that certain of his financial documents such as tax returns and loan applications were not available to him because he had intended to hide the same from his wife and is now unable to locate them.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Burden of Proof

The burden of proof in this action is upon AT & T to establish the elements under 11 U.S.C. § 523(a)(2)(A) by a preponderance of the evidence. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge are to be narrowly construed in favor of the debtor. *See In re Black,* 787 F.2d 503, 505 (10th Cir.1986).

### *Analysis*

AT & T seeks to have the debt owed to it by Herrig declared nondischargeable under section 523(a)(2)(A) of the United States Bankruptcy Code, which provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A) (West 1998). This circuit has ruled that in order to prevail under this section, a creditor must establish each of the following elements by a preponderance of the evidence:

(1) That a representation was made by the debtor;

(2) That the representation was false;

(3) That the representation was made with the intent to deceive the creditor;

(4) That the creditor relied upon the representation;

(5) That such reliance was reasonable; and

(6) That, as a result of such reliance, the creditor suffered loss.

*In re Young,* 91 F.3d 1367, 1373 (10th Cir. 1996). Unless all of these items are established by a preponderance of the evidence, the debt is dischargeable. The United States Supreme Court has adopted the same test, except that the reliance standard to be used is the less stringent subjective standard of "justifiable" reliance, rather than the objective standard of "reasonable" reliance. *Field v. Mans,* 516 U.S. 59, 74–75,

116 S.Ct. 437, 446, 133 L.Ed.2d 351, 365 (1995). Notwithstanding the decision of the Tenth Circuit in *Young,* this Court will use the justifiable reliance standard set forth by the United States Supreme Court.

## Representation

The prevailing view among bankruptcy courts is that a signature on a charge slip constitutes a representation that the cardholder "has the ability and the intention to pay for the goods and services charged." *In re Nahas,* 181 B.R. 930, 933 (Bankr.S.D.Ind. 1994) (citations omitted); *see also In re Willis,* 190 B.R. 866, 870 (Bankr.W.D.Mo.1996); *In re Briese,* 196 B.R. 440, 450 (Bankr. W.D.Wis.1996) ("[W]hen making a purchase or obtaining a cash advance, there is little doubt that the debtor makes a representation—namely, the promise to pay for the credit advanced."). The United States Court of Appeals for the Ninth Circuit has ruled that while the signature on a charge slip may not be a representation of a present ability to pay the charges incurred, it is an affirmative representation of the cardholder's *intent* to someday repay the charges incurred. *In re Anastas,* 94 F.3d 1280, 1285 (9th Cir.1996). At least one court has gone to the other end of the spectrum, holding that the signature by a cardholder on a charge slip does not constitute any form of representation. *In re Alvi,* 191 B.R. 724, 732 (Bankr.N.D.Ill.1996).

The act of signing a charge slip (or, in this case, signing the documents necessary to obtain a cash advance) cannot be without meaning. For purposes of this decision, the Court assumes that one element of an agreement to extend credit is an agreement to ultimately repay it, even if done by a personal representative after the death of the cardholder. The Court finds that as Herrig obtained the cash advances, he represented to AT & T that he intended, some day, according to the terms of the credit agreement, to repay the advances. This Court respectfully disagrees with the position taken by Judge Ginsberg in *Alvi.* Taken to its logical conclusion, the *Alvi*

decision would render all credit card debt dischargeable, regardless of the intent of the debtor as he or she incurred charges. *See also In re Ward,* 857 F.2d 1082, 1088 (6th Cir.1988) (Merritt, J., dissenting) (signature of cardholder is essential element of consideration for credit card transaction; if signature is meaningless, all credit card transactions fail for lack of consideration).[2]

## Falsity and Intent to Deceive

While there are several approaches used by courts to determine whether a debtor has made a representation with the intent to deceive a creditor, the Tenth Circuit has adopted the "totality of the circumstances" approach. *See In re Young,* 91 F.3d at 1375. Courts which have used this approach acknowledge the fact that rarely, if ever, will a debtor admit his or her intent to deceive while under oath. *See In re Eashai,* 87 F.3d 1082, 1090 (9th Cir.1996). Therefore, the courts have identified the following objective factors which are to be considered in determining whether the debtor possessed the necessary fraudulent intent to deceive:

(1) The time which elapses between the charges at issue and the filing of the bankruptcy;

(2) The total number of charges and whether multiple charges were made on the same day;

(3) The total amount of charges and whether charges were made in such an amount as to deter the creditor from learning of the same; i.e., whether they were below a "floor limit" such that verification of the charge would not be made;

(4) Whether the debtor exceeded the credit limit on the account;

(5) Whether the purchases represent a significant change in the ordinary buying habits of the debtor;

(6) Whether the debtor had consulted a bankruptcy attorney prior to incurring the charges;

**2.** The Court does not believe that the use of a credit card should be considered a statement of a current **ability** to pay for purposes of § 523(a)(2)(A). As several courts have noted, "[N]on-written representations respecting a debt-

or's financial condition may not form the basis of a nondischargeability lawsuit under § 523(a)(2)(A)." *AT&T Universal Card Services v. Akdogan (In re Akdogan),* 204 B.R. 90, 95 (Bankr. E.D.N.Y.1997) (and cases cited therein).

(7) Whether the purchases were made for luxuries or necessities;

(8) The nature of the debtor's financial position at the time of the charges;

(9) The employment status of the debtor; and

(10) The financial acumen of the debtor.

*In re Berz,* 173 B.R. 159, 163 (Bankr.N.D.Ill. 1995); *In re Touchard,* 121 B.R. 397, 401 (Bankr.D.Utah 1990); *In re Hiemer,* 184 B.R. 345, 347 (Bankr.D.Neb.1995). In reviewing these factors, courts do not apply a standard "litmus test," nor do they engage in simple mathematics to determine dischargeability based upon the number of factors present; instead, these factors are guidelines which allow the courts to make a determination on a case by case basis.

 This Court believes that the focus of the inquiry here is not whether the debtor represented that he had the ability to repay the advances at issue, but instead whether the debtor represented that he would repay the advances at a time when he had no intent to do so. In adopting this approach, the Court finds the following analysis persuasive:

> We have previously held that reckless disregard for the truth of a representation satisfies the element that the debtor has made an intentionally false representation in obtaining credit. *Houtman v. Mann (In re Houtman),* 568 F.2d 651, 656 (9th Cir.1978). However, in applying the concept of reckless disregard for the truth of a representation in the case of credit card debt, we must be careful to keep in mind that the representation being made by the card holder is solely as to *intent* to repay, not as to the debtor's *ability* to repay. Thus, courts faced with the issue of dis-

chargeability of credit card debt must take care to avoid forming the inquiry under § 523(a)(2)(A) as whether the debtor recklessly represented his financial condition. The correct inquiry is whether the debtor, either intentionally or with recklessness as to its truth or falsity, made the representation that he intended to repay the debt.

*In re Anastas,* 94 F.3d at 1285–1286.[3] Thus, the issue before the Court is whether Herrig did not intend to repay the advances at the time he obtained them from AT & T.

 The Court finds that the Debtor had no intent to repay AT & T as he obtained the cash advances in question. In making this finding, the Court focuses on the following factors:

(1) The advances were undertaken to repay gambling debts. In the view of this Court, participation in gambling activities constitutes a luxury, and not a necessity;

(2) The total number of charges was such as to effectively exhaust the credit available under the Card in a very short period of time;

(3) At the time of the cash advances, Herrig did not have the ability to repay the amounts borrowed. He testified that at the time of the advances, he had monthly income of $2,457.44, and monthly expenses of $2,632.00.[4] In addition, Herrig had amassed gambling debts in the aggregate amount of approximately $46,000.00, and other credit card debt totaling $18,971.89; and

(4) Herrig's testimony that he expected to repay the cash advances through the use of the "credit card checks" from Chase is not credible. In support of the latter theory,

**3.** The *Anastas* decision includes a statement that the focus of the court's inquiry must be "whether the debtor maliciously and in bad faith incurred credit card debt *with the intention of petitioning for bankruptcy and avoiding the debt.*" 94 F.3d at 1286 (emphasis added). This Court respectfully disagrees. A debtor need not have devised his or her escape route (i.e. the filing of a bankruptcy case) in order to formulate the intent not to repay a debt. If this Court were to adopt the position that a debtor *must* have decided to file for bankruptcy at the time charges were incurred in order for those charges to be non-dischargeable, it would effectively destroy the "totality of the circumstances" approach adopted by the

Tenth Circuit in *In re Young,* 91 F.3d at 1375 by making the absence or presence of one of the factors (intent to file bankruptcy) determinative of the outcome in every case.

**4.** In his original testimony, Herrig indicated that his monthly expenses at the time of the cash advances were only $1,200.00. Upon further examination, Herrig admitted that his income and expenses at the time of the cash advances were roughly the same as listed in statements of income and expenses filed with his petition in bankruptcy.

Herrig testified that he did not believe that Chase would have sent him five of the "credit card checks" if it did not intend to permit him to write them for an amount several times greater than his allowed credit limit. The old adage "I can't be out of money because I still have checks," although it may remain a popular decoration on t-shirts, is not persuasive in this Court.

(5) Herrig's testimony that he expected to repay the cash advances through continued gambling is also not credible. The Court notes that Herrig admitted that his gambling activities were undertaken with local (and presumably illegal) "bookies." At the time of the advances in question, Herrig admitted to owing over $46,000.00 to these "bookies." Many of these "bookies" were paid prior to the filing of this bankruptcy case; those who were not paid were not scheduled as creditors. This Court believes that Herrig intended to use the credit card advances in question to pay his gambling debts with no intent or regard as to how, if ever, he would repay those advances. Herrig consciously chose to pay those creditors whose collection methods may have posed a threat to his health and the health of his family at the expense of his creditors who use more conventional collection methods.

This Court is aware of decisions which hold that compulsive gamblers or gambling "addicts" who sincerely believe that they will win sufficient funds to repay their debts do not intend to defraud creditors, and that, as such, their debts incurred as a result of their gambling excursions are properly subject to discharge. See, e.g., In re Briese, 196 B.R. 440 (Bankr.W.D.Wis.1996). Those cases are not germane to the facts at bar. In each of those cases, the debtor used the funds at issue to continue gambling in an effort to generate sufficient winnings to pay off their credit cards. In the present case, Herrig used the funds at issue to pay off old gambling debts. There was no possibility that

the funds which Herrig obtained from AT & T would generate any new monies.[5] The Court specifically finds that Mr. Herrig's involvement in gambling activities does not demonstrate a good faith subjective intent to repay AT & T in this case.[6]

**Justifiable Reliance**

The next issue is whether the reliance of AT & T upon the representations of Herrig was justifiable. AT & T went into great detail to establish the parameters which they used to determine Herrig's creditworthiness at the time they issued the card. At the time of the advances in question, Herrig had used the Card for over three years. During that time period, Herrig paid all amounts due to AT & T without default. AT & T did not allow Herrig to abuse the card, draw amounts in excess of the credit limit, or otherwise fail to pay attention to Herrig's use of the Card in a fashion that would have facilitated its misuse. On that basis, AT & T argues that its reliance upon the signature of Mr. Herrig in extending $3,900.00 in credit in the form of cash advances was justified. Herrig's only response is a one sentence statement in his trial brief to the effect that a credit card debt is dischargeable when the card issuer fails to properly inquire as to the debtor's ability to repay.

As it established the standard to be applied in § 523(a)(2)(A) proceedings, the United States Supreme Court provided the following definition of "justifiable reliance":

The Restatement [ (Second) of Torts (1976) ] expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." Id., § 540. . . . Here a contrast between justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable. . . . this does not mean that his

---

**5.** Herrig testified that he continued to gamble as his financial crisis deepened, and may have won between $4,000.00 and $5,000.00 in a two month span sometime after obtaining the advances at issue. However, there is no evidence in the record that any of those purported winnings were used to reduce debt.

**6.** This should not be construed by the reader as an endorsement or adoption by this Court of the rationale contained in the Briese decision.

conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all cases." *Id.*, § 545A.

*Field v. Mans,* 516 U.S. at 70–71, 116 S.Ct. at 443–44 (footnotes omitted). One court, applying the *Field v. Mans* standard in the context of credit card use, defined justifiable reliance as follows:

> Reliance in a credit card context, as in any other context, is justifiable if the falsity of the representation is not apparent to "one of his knowledge and experience from a cursory glance." In rejecting those cases that impose a duty to investigate in the absence of anything that would arouse suspicion, the Supreme Court implicitly accepts as justifiable the extension of credit where the card use does not send up any red flags. Thus, following an initial credit check that uncovers no problems, if a cardholder's use is consistent with his past use, and the cardholder is paying the minimum charge and staying within credit limits, reliance on the cardholder's implied representation of intent to repay will generally be justifiable.

*In re Feld,* 203 B.R. 360, 370 (Bankr.E.D.Pa. 1996). *See also In re Anastas,* 94 F.3d at 1286 ("[T]he credit card issuer justifiably relies upon a representation of intent to repay as long as the account is not in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable."); *In re Simos,* 209 B.R. 188, 193 (Bankr.M.D.N.C.1997).

Other courts have taken a far stricter view of the concept of "justifiable reliance" in the world of credit card transactions. Those courts, noting that the consumer market has been flooded with "pre-approved" credit card offers such as the one before this Court today, have ruled that the card issuer is relying upon its own judgment and experience as it issues the card and as it determines whether to honor any specific charge made upon the card, and not upon any representation made by the cardholder. Consider the following:

> Credit card issuers are sophisticated lenders. They make their decisions to offer customers credit cards not out of some altruistic notion of helping society, but because credit cards are very profitable. They carefully solicit customers who are most likely to use their services in a manner that increases those profits. They don't seek out or want customers who demonstrate an ability to pay by paying their other accounts in full each month.... A credit score demonstrates a likelihood a debtor will not default. It is not based upon an analysis of one's assets, secured liabilities, and living expenses.
>
> . . .
>
> Credit scoring reflects the practice of targeting individuals who use many credit cards and pay the minimum amount each month, rather than paying off their balance. Mr. Carter testified that a minimum payment on UCS's card is 2.1 percent of outstanding balance each month. Surely UCS understands that customers with excess disposable income would not choose to make minimum payments leaving balances that incur interest in excess of 15 percent per annum. Offering this customer a pre-approved credit card, without making any individual inquiry into her financial status, is the equivalent of buying a horse with one eye. If the credit card issuers choose to continue this profitable technique to increase their customer base, they cannot claim that they justifiably relied upon any representation that the customer made at the time the card was issued. In other words, a creditor cannot justifiably rely on any representation, or the absence thereof, made by a card holder if the card was pre-approved, and no direct financial information was obtained by the issuer. Moreover, if UCS did not justifiably rely upon Ms. Ellingsworth's representations at the time the card was issued, reliance cannot then attach when the card is used. I find, therefore, that the credit in this case was extended to Ms. Ellingsworth without justifiable consideration of her ability to pay.

*AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth),* 212 B.R. 326, 338–339 (Bankr.W.D.Mo.1997) (footnotes

omitted); *see also AT&T Universal Card Services v. Burns (In re Burns)*, 196 B.R. 11, 13 (Bankr.W.D.N.Y.1996) ("One who lacks concern for its borrower's solvency when enabling the borrowing cannot prove it was defrauded merely by proving the borrower was insolvent and knew it."); *AT&T Universal Card Services v. Akdogan (In re Akdogan)*, 204 B.R. 90, 97 (Bankr.E.D.N.Y.1997) (creditor must perform some form of credit check or otherwise establish that credit was not extended blindly); *In re Hernandez*, 208 B.R. 872, 880 (Bankr.W.D.Tex.1997) (creditor must "demonstrate by affirmative proof the reliance element of its § 523(a)(2)(A) action.").

*Ellingsworth* is both well-reasoned and persuasive. What causes this Court to part with the *Ellingsworth* analysis is that it operates to render all credit card debt dischargeable, and no reliance justifiable, regardless of the subjective intent of the debtor. If the element of justifiable reliance went solely to the ability to repay, and not the intent to repay, the *Ellingsworth* analysis would be more palatable. In addition, if AT & T had presented no evidence as to why it believed that Herrig had the intent to pay the sums advanced, the Court would be less inclined to find its reliance justifiable. This Court believes that Congress did not intend to provide for the discharge of debt in situations where a debtor obtained money, property, or credit with no subjective intent to repay the same. To allow the discharge of such debt would be in direct contradiction to the oft-stated goal of bankruptcy: to help the "honest, but unfortunate debtor." *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934); *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). The ruling of the Court today, that a debtor may not discharge debt obtained with no intent to repay the same, or with a reckless disregard as to how it will be repaid, is consistent with this goal. In addition, the Court believes that such a ruling is a narrow reading of § 523(a)(2)(A) in accordance with the instructions of the Tenth Circuit. *See In re Black*, 787 F.2d at 505.

This Court has found that Herrig falsely represented to AT & T that he intended to repay the sums which AT & T advanced to him. There can be no doubt that AT & T relied on the representations; surely no one would suggest that AT & T would have honored the requests for advances in the face of a statement by Herrig that he did not intend to repay them. In the present case, AT & T had a three year history of performance as promised by Herrig at the time of the advances in question. AT & T also monitored the account and determined that Herrig had maintained an acceptable credit score. Accordingly, this Court finds that AT & T's reliance upon the representations made by Herrig was justifiable.

**Loss**

As noted above, AT & T advanced $3,900.00 to Herrig. The money has not been repaid. Clearly, AT & T suffered loss.

### *Conclusion*

The debt owed to AT & T by Herrig for cash advances in the amount of $3,900.00 is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. However, AT & T also requests interest on said amount. No evidence has been presented to the Court concerning the interest rate on the credit card in general and cash advances in particular. AT & T did not put the credit card agreement into evidence or provide any testimony as to the current amounts due or the applicable rate of interest. The Court will not hypothecate as to these matters. The burden is on AT & T to prove the amounts due and owing. Therefore, the Court will award judgment to AT & T in the amount of the cash advances, plus applicable post judgment interest.

A separate judgment is entered concurrent with this memorandum opinion.

### **JUDGMENT**

THIS MATTER came before the Court for trial on January 15, 1998. Plaintiff AT & T appeared by and through its attorney, Michael Morgan. Defendant Dennis Florian Herrig ("Debtor" or "Mr. Herrig") appeared by and through his attorney, Gary G. Grisso. The Court received evidence and heard argument from the parties.

The issues having been duly considered and a decision having been duly rendered, for the reasons set forth in the Memorandum Opinion filed concurrently herewith,

IT IS HEREBY ORDERED that the debt owed to AT & T by Dennis Florian Herrig be, and the same hereby is, nondischargeable under 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that judgment is entered in favor of AT & T and against Dennis Florian Herrig in the amount of Three Thousand Nine Hundred and no/100ths Dollars ($3,900.00), plus post judgment interest as set forth herein.

IT IS FURTHER ORDERED that post judgment interest shall accrue on the judgment from and after this date at the rate of 5.407 percent (5.407%) per annum.