**In re Terry Lester HOYT, Debtor.**

**Bank of Commerce, an Oklahoma Bank, Plaintiff,**

v.

**Terry Lester Hoyt, Defendant.**

**Bankruptcy No. 00–04170–M. Adversary No. 01–0023–M.**

United States Bankruptcy Court, N.D. Oklahoma.

April 25, 2002.

John J. Carwile, Tulsa, OK, for Plaintiff.

Robert A. Todd, Tulsa, OK, for Defendant.

### MEMORANDUM OPINION

TERRENCE L. MICHAEL, Bankruptcy Judge.

THIS MATTER came on for trial on March 21 and 22, 2002. Plaintiff Bank of Commerce ("Bank") appeared through its attorney, John J. Carwile. Defendant Terry Lester Hoyt ("Dr. Hoyt") appeared personally and through his attorney, Robert A. Todd. At trial, the Court received evidence and heard argument from the parties. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

#### Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28

U.S.C.A. § 1334(b).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a). This is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(I).

## Burden of Proof

██ Bank seeks an order of this Court determining that certain obligations owed to Bank by Dr. Hoyt are non-dischargeable under § 523(a)(2)(A) and § 523(a)(6). The burden of proof in this action is upon Bank to establish each of the elements under § 523(a)(2)(A) and/or § 523(a)(6) by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287–288, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge are to be narrowly construed in favor of the debtor. *See In re Black*, 787 F.2d 503, 505 (10th Cir.1986); *see also AT & T v. Herrig (In re Herrig)*, 217 B.R. 891 (Bankr. N.D.Okla.1998) (hereafter *"Herrig"*).

## Findings of Fact

Dr. Hoyt is a licensed physician. At all times between 1991 and September 22, 2000, Dr. Hoyt practiced medicine in the city of Chelsea, Oklahoma. When he came to Chelsea in 1991, Dr. Hoyt was the only practicing physician in the city. Dr. Hoyt commenced his practice under the name "Chelsea Family Medical Clinic" (the "Clinic"). By all accounts, Dr. Hoyt is an admirable physician, but lacks business management skills. Originally, Dr. Hoyt operated the Clinic as a sole proprietorship. The Clinic was later incorporated, with Dr. Hoyt as its sole shareholder and chief executive officer. At all times when he owned the stock of the Clinic, Dr. Hoyt was the person responsible for making all business and financial decisions. In 1993, Dr. Hoyt sold the Clinic to Claremore Regional Hospital. He repurchased the

Clinic from said hospital in 1995. Thereafter, in 1997, Dr. Hoyt sold the Clinic to Hillcrest Medical Center. After the sale, Dr. Hoyt remained with the Clinic as an employee. Dr. Hoyt repurchased the Clinic in October of 1998.

The Bank financed the 1998 reacquisition of the Clinic by Dr. Hoyt. On or about February 3, 1999, the Clinic executed and delivered to the Bank a promissory note in the principal amount of $282,600.00 (the "First Note"). The First Note was a renewal of prior notes, and contained a notation that its purpose was to provide for the "purchase of medical center and working capital." Under the terms of the First Note, the indebtedness was to be amortized over a ten-year period, with interest at the rate of 8.5% per annum. Monthly payments of principal and interest were due commencing March 3, 1999.

As security for the First Note, the Clinic granted the Bank a security interest in

All equipment, accounts, inventory, fixtures and general intangibles of whatever kind or nature, wherever located, now owned or hereafter acquired, and all returns, repossessions, exchanges, substitutions, replacements, attachments, parts, accessories, and accessions thereto and thereof and all proceeds thereof (whether in the form of cash, instruments, chattel paper, general intangibles or otherwise). [The] [a]bove description is to specifically include, but not be limited to, Twix Pentium III 480MHz Paradigm Enterprise Server; Twix Pentium 480MHz Workstation, and all attachments, software, and network options contained and made a part of therein.

*See Bank Exhibit 1, p. 3.* The Security Agreement also contained the following provisions:

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2002).

(d) *CASH AND OTHER REMITTANCES:* Upon demand of and as specified by Secured Party, when Debtor receives any checks, trade acceptances, drafts, cash or other remittances in payment of accounts or other Collateral or as proceeds of inventory or other Collateral, Debtor shall apply the same directly on Debtor's liability to Secured Party, or deposit the same in a special account maintained with Secured Party and from which Secured Party has the power of withdrawal. If Secured Party so requires, Debtor will promptly notify Secured Party of such applications or deposits, identifying in writing the source of same and the collateral which has been converted into same. The funds in any such special account shall be held by Secured Party as security for all Debtor's liabilities to Secured Party. Said proceeds shall be deposited in precisely the form received, except for Debtor's endorsement where necessary to permit collection of items, which endorsement Debtor agrees to make, and which Secured Party is hereby granted a power of attorney to make on Debtor's behalf if Debtor fails or refuses to make such endorsement. Pending such deposits, Debtor agrees that any such checks, drafts, cash or other remittances will not be commingled with any of Debtor's funds or property, but will be held separate and apart and in trust for Secured Party until deposit of same is made in the special account. Secured Party will, at intervals to be determined by Secured Party, apply the whole or any part of any monies which are on deposit with Secured Party, whether owned by Debtor or any other party liable under this Agreement, against the principal or interest due on any loans made to Debtor by Secured Party, or against Debtor's other liabilities to Secured Party secured by this Agreement, at Secured Party's sole option, unless so applying those deposits would contravene any written agreement between Debtor and Secured Party or any government regulation. Any portion of such funds on deposit which Secured Party elects not to apply will be paid to Debtor by Secured Party.

(e) *PROCEEDS:* Whenever the sale, exchange, or other disposition of inventory or other Collateral gives rise to an account, chattel paper, instrument, or general intangible for the payment of money ("proceeds" for purposes of this paragraph), Debtor, as required by Secured Party, shall notify Secured Party promptly of the disposition of said inventory or other collateral and any resulting proceeds. With respect to all proceeds covered by this Agreement, Debtor represents that (i) no set-off or counterclaim exists or shall be permitted to exist (ii) no agreements have been or shall be made for any material modification, deduction or discount, and (iii) no partial payments have been or shall be made except as revealed to Secured Party by Debtor in writing. All proceeds where the right to payment has not yet been earned by performance shall be evidenced by a binding written contract between Debtor and third parties, and copies of such contracts shall be provided to Secured Party. Secured Party shall have the right to notify any account debtor or obligor of Debtor's obligation to make payments directly to Secured Party and Secured Party may take control of all proceeds, which right Secured Party may exercise at any time. Until such time as Secured Party elects to exercise such right, Debtor is authorized as Secured Party's agent to collect and enforce such proceeds. The costs of such collection and enforcement, including attorneys' fees and other expenses,

shall be borne by Debtor, whether incurred by Secured Party or Debtor.

*See id. at p. 7.* Notwithstanding these provisions, the Bank allowed the Clinic to retain and use proceeds of accounts receivable in its operations. Dr. Hoyt and representatives of the Bank testified that the "life blood" of the Clinic was the accounts receivable which it generated. The Clinic was required to provide the Bank with monthly statements of its accounts receivable. The Clinic also maintained its principal checking account at the Bank.

The Court heard extensive testimony regarding the generation of medical accounts receivable. The process begins with the physician. When a physician treats a patient, he or she identifies the treatment using a multi-digit code described as a "CPT code." Using the CPT code, an employee of the Clinic could generate a bill for the services rendered. In order to bill an insurance company or governmental entity such as Medicare or Medicaid, another number, described as a "provider number," is also required. Most (if not all) physicians have a provider number, as do many medical entities such as hospitals. A provider number cannot be used without the permission of the person or entity to whom it is assigned. Unless an entity has the CPT code, the provider number and permission to use the same, no bills can be generated. The Clinic kept all of its billing and accounts receivable records on its computer system.

On February 13, 1999, the Clinic was destroyed by fire. Virtually all of the Clinic's records, including those related to accounts receivable, were lost.[2] At the time, the accounts receivable of the Clinic were approximately $274,785.83. *See Defendant's Exhibit 11.* The amount of insurance carried by the Clinic was inadequate to cover the loss sustained. After the fire, the Clinic operated at a significant loss. The destruction of virtually all of the records relating to the accounts receivable generated prior to the fire made it difficult, if not impossible, to collect the same.[3]

At the time of the fire, the Clinic was the only medical facility in Chelsea. Dr. Hoyt was the only licensed physician. The financial condition of the Clinic was precarious even before the fire. On numerous occasions, the Clinic's account at the Bank was overdrawn. At times, the overdraft approached $100,000.00. When the fire occurred, the Bank, through its board of directors, made a conscious decision to keep the Clinic afloat. The Bank also desired to address the overdraft situation in the Clinic's bank account. The Bank was also having some difficulty collecting amounts owed to it directly by Dr. Hoyt. In addition, the Clinic operated at a leased facility owned by the Chelsea Medical Authority (the "CMA") and was several months in arrears on its rental payments

---

2. Although the computer system utilized by the Clinic did make provision for "backing up" the server's database, the backup tape was also destroyed in the fire.

3. The Court heard the testimony of Ms. Peggy Noble regarding the ability of the Clinic to collect the "pre-fire" accounts receivable. Ms. Noble, who has significant experience in the collection of medical accounts receivable, testified that it would be difficult if not impossible to collect said accounts without the records lost in the fire. In addition, Ms. Noble testified that, without those records, any attempts to collect the accounts receivable would carry a significant risk of violation of Medicare and/or Medicaid regulations. Ms. Noble opined in a letter dated May 29, 2000, that this risk was so great as to preclude any efforts to collect the "pre-fire" accounts receivable. *See Bank Exhibit 18.* Her testimony was uncontradicted. Notwithstanding these difficulties, the Clinic was able to collect approximately $19,000.00 of these "pre-fire" receivables.

to the CMA. According to Jan Miller, president of the Bank, the Bank was aware of potential collectibility problems with the "pre-fire" receivables and discussed the issue with Dr. Hoyt in the spring of 2000. As is often the case in disputes which come before this Court, the solution arrived at by the Bank, the Clinic and Dr. Hoyt was to borrow additional funds.

With the Bank's assistance, the Clinic and Dr. Hoyt applied for a second loan of $200,000. This loan was guaranteed by the Small Business Administration (the "SBA") as well as Dr. Hoyt.[4] In the application for this loan, the Bank represented to the SBA that "Dr. Hoyt has met all obligations [to the Bank] in a timely manner." *See Defendant's Exhibit 1*, p. 7. At the time this representation was made, the Clinic had an overdraft at the Bank of approximately $80,000.00, and Dr. Hoyt was several months in arrears on a personal obligation to the Bank secured by his home. This loan (the "SBA Loan") was ultimately approved.

The SBA Loan was closed on or about April 4, 2000. The proceeds from the SBA Loan were used as follows:

| | |
|---|---|
| Pay off prior Bank loan (overdraft): | $88,547.83 |
| Cover current Bank overdrafts: | $23,000.00 |
| Interest on Bank loan: | $13,141.00 |
| SBA Loan fee: | $ 4,580.00 |
| Tulsa Economic Development Corporation Fee: | $ 1,000.00 |
| Payment on personal Bank loan (house): | $12,443.86 |
| Purchase of new computer system for Clinic: | $27,986.86 |

The remaining balance of the SBA loan was used by the Clinic as operating capital.

These funds were rapidly expended in the operation of the Clinic.

The financial situation of the Clinic did not improve. During the first week of July, 2000, the Bank dishonored payroll checks drawn on the Clinic's account, which was overdrawn at the time. Dr. Hoyt confronted the Bank regarding its refusal to honor payroll checks. Although the Bank ultimately honored the payroll checks, the incident caused Dr. Hoyt to evaluate his future in Chelsea and with the Bank. He also opened an account for the Clinic at Grand Lake Bank (the "Grand Lake Bank Account") and began depositing proceeds of accounts receivable into that account.[5] The Clinic deposited the following sums into the Grand Lake Bank Account:

| | |
|---|---|
| August, 2000: | $ 7,114.14 |
| September, 2000: | $ 4,148.76 |
| October, 2000: | $ 4,179.95 |
| **Total:** | **$15,442.85** |

*See Bank Exhibit 10*, pp. 1, 104 and 138. The monies deposited in the Grand Lake Bank Account appear to be proceeds of accounts receivable of the Clinic. Although the record is not complete, it appears that the checks written on the Grand Lake Bank Account were used to pay employees or expenses of the Clinic. All checks drawn on the Grand Lake Bank Account were signed by Dr. Hoyt.

Shortly after his confrontation with the Bank in July of 2000, Dr. Hoyt entered into discussions with representatives of the Sparks Medical Clinic in Fort Smith, Arkansas (the "Sparks Clinic") regarding future employment. An agreement for employment was reached between Dr. Hoyt

---

4. The SBA guarantee operated to the sole benefit of the Bank. It does not relieve the Clinic of any of its obligations, nor does it limit the scope of any guaranty executed by Dr. Hoyt.

5. The exact date this account was opened is uncertain. The exhibit offered by the Bank indicates that the first deposit was made into this account on August 25, 2000. *See Bank Exhibit 10*, p. 1.

and the Sparks Clinic sometime in mid-July. Dr. Hoyt made an earnest deposit towards the purchase of a home in Fort Smith on July 19, 2000. The Sparks Clinic and Dr. Hoyt agreed that his first day of work at the Sparks Clinic would be October 1, 2000.

After entering into this agreement with the Sparks Clinic, Dr. Hoyt returned to Chelsea to wind up his business and personal affairs. He did not make public the fact that he was leaving Chelsea until on or about August 20, 2000. Dr. Hoyt testified that he did not immediately disclose the fact that he was leaving because he wished to have some arrangements for patient care in place prior to such an announcement. If plans for patient care were in place, Dr. Hoyt felt that much of the turmoil surrounding his leaving could be avoided.

Things began to unravel a bit upon Dr. Hoyt's return. One of his office employees, a Ms. McCreary, who had the primary responsibility for billing insurance companies, gave her two weeks notice, and left the Clinic on or about August 1, 2000. The Clinic's other clerical employee, Helen York, had little experience in billing insurance companies. Dr. Hoyt was not sufficiently familiar with the Clinic's billing system to generate bills by himself. The result was that billings and collections were significantly impaired. Although Dr. Hoyt continued to see patients at the Clinic until the close of business on September 22, 2000, no bills were ever generated for services rendered between August 31 and September 22, 2000.

At some point in time in August of 2000, the Bank learned of the existence of the Grand Lake Bank Account. A meeting was held on August 31, 2000, between Dr. Hoyt, Jan Miller and Tom Farus, a Vice President of the Bank who was the loan officer responsible for the credit extended to the Clinic. At that meeting, Dr. Hoyt informed Mr. Miller and Mr. Farus that he intended to sell the Clinic. Dr. Hoyt did not make mention of Ms. McCreary's departure, nor did he inform the Bank that they would need to commence collection of the Clinic's accounts receivable. The issue of the Grand Lake Bank Account was also discussed. The Bank agreed to honor payroll checks drawn on the Clinic account so long as all deposits of accounts receivable were made into the Clinic's account at the Bank. The Bank also agreed not to set off amounts in the Clinic account against its indebtedness to the Bank for a period of two weeks. The Bank did not oppose the sale of the Clinic. According to the Bank, Dr. Hoyt expected to retain the accounts receivable in the event of a sale. Those receivables would then be collected and applied to the Bank's indebtedness. The Bank asked for a listing of the Clinic's current accounts receivable, which Dr. Hoyt agreed to and did provide. *See Plaintiff's Exhibit 8.* It was hoped that between the collection of accounts receivable and the obtaining of a fair price for the Clinic, the debt to the Bank would be largely or completely satisfied.

There was a significant dispute in the evidence regarding whether Dr. Hoyt concealed his intent to leave the town of Chelsea. According to representatives of the Bank, Dr. Hoyt did not inform the Bank that he intended to leave Chelsea at the August 31, 2000, meeting. Both Mr. Miller and Mr. Farus testified that they learned of Dr. Hoyt's impending departure in mid-to-late September of 2000. Dr. Hoyt testified that he sent a letter to all of his patients informing them of his plans on August 20, 2000, and that he informed both the Bank and the CMA of his intentions a few days prior to the sending of this letter. Mr. George Fraley, the chair of the CMA and a director of the Bank, testified that

he received a letter from Dr. Hoyt dated August 20, 2000, in which Dr. Hoyt informed the CMA that Dr. Hoyt would be leaving Chelsea. After reviewing the evidence and the demeanor of the witnesses during their testimony, the Court concludes that Dr. Hoyt made his intent to leave Chelsea a matter of public knowledge on or about August 20, 2000. The Court also concludes that Mr. Fraley personally became aware of the fact that Dr. Hoyt would be leaving Chelsea on or about that date.[6]

During the period between July 14, 2000, and September 27, 2000, Dr. Hoyt attempted to market the Clinic. Ultimately, the highest offer he received for the Clinic was approximately $12,000.00. This greatly discouraged Dr. Hoyt. In late September of 2000, Dr. Hoyt made contact with a Dr. Weston. Dr. Weston expressed some interest in acquiring the Clinic. In the eyes of Dr. Hoyt, Dr. Weston was his best and last hope for a sale of the Clinic at a fair price. In anticipation of receipt of an offer to purchase from Dr. Weston, Dr. Hoyt asked the CMA board to hold a meeting on September 27, 2000, to discuss the potential sale of the Clinic. The board agreed to hold such a meeting at the premises of the Clinic.

On the eve of the September 27th meeting, Dr. Weston withdrew his interest in purchasing the Clinic. As a result, Dr. Hoyt failed to attend the meeting which he requested; instead, he spent the day supervising the movers who were packing his personal belongings for the move to Arkansas. The meeting went forward in Dr. Hoyt's absence. At that time, the CMA decided to terminate its relationship with the Clinic, and lease the Clinic premises to Claremore Regional Hospital. The only employee of the Clinic on site at the time, Helen York, was escorted from the premises. The Bank took possession of its collateral, including the Clinic's computer system, and secured the same at the Clinic. Ms. York was never allowed to return.

The Clinic ceased operations as of September 22, 2000. Dr. Hoyt moved to his new practice in Arkansas. Helen York remained in Chelsea and continued to do some work for the Clinic. Her effort focused upon providing medical records to former patients of the Clinic or to their new health care providers. She made no effort to bill or collect accounts receivable after her removal from the Clinic on September 27, 2000; indeed, without the Clinic's computer system (which had been repossessed by the Bank), she was powerless to do so. When the Clinic closed, it had accounts receivable of approximately $212,965.85. *See Plaintiff's Exhibit 8.* This number does not include amounts owed for any of the services performed between September 1 and 22, 2000, nor does it include any "pre-fire" accounts receivable.

The relationship between the Bank and Dr. Hoyt, already strained as of September 22, 2000, took a turn for the worse. On October 31, 2000, Dr. Hoyt wrote to the Bank advising the Bank that neither he nor Ms. York was attempting to collect the accounts receivable of the Clinic, noting that the computer containing all records regarding the same was in the possession of the Bank. *See Bank Exhibit 25.* Thereafter, on February 27, 2001, Dr. Hoyt remitted to the Bank certain Clinic receivables which had been delivered to him, and stated in a letter to Mr. Farus that he trusted that the Bank was "actively

---

6. This conclusion is based in part upon Mr. Fraley's testimony that he began, on behalf of the Authority, to negotiate with Claremore Regional Hospital to lease the premises occupied by the Clinic, and by the undisputed testimony that the Authority approved the entry of Claremore Regional Hospital into the Clinic premises on September 27, 2000.

working" the accounts receivable. *See Bank Exhibit 26.* A similar letter was sent by Dr. Hoyt to Mr. Farus on March 19, 2001. *See Bank Exhibit 27.* On March 23, 2001, the Bank replied to Dr. Hoyt. In the reply, the Bank requested the passwords for the computer system, and stated the Bank's expectations that Dr. Hoyt, and not the Bank, was responsible for collection of the accounts receivable. *See Bank Exhibit 28.* On April 16, 2001, Dr. Hoyt responded by stating that he was unsure of the exact passwords, as he did not use the computer system without assistance. *See Bank Exhibit 29.* On May 20, 2001, the Bank sent a letter to Dr. Hoyt acknowledging receipt of certain funds from Dr. Hoyt, and again expressing concern that he was not making sufficient efforts to collect the Clinic's accounts receivable. *See Bank Exhibit 30.*[7] On July 10, 2001, Dr. Hoyt sent certain claim forms to the Bank, and again stated his belief that the Bank needed to begin collecting the accounts receivable. *See Bank Exhibit 31.* The net result of the parties' conduct is that no efforts were ever made to collect the Clinic's accounts receivable or to even generate bills for services rendered at the Clinic between September 1 and September 22, 2000.

The Bank ultimately sold all of the collateral which it had repossessed. With respect to the computer system, the Bank never attempted to retrieve any of the information contained therein. Instead, the Bank made a conscious decision that, due to confidentiality concerns relating to medical records, it would take no steps to collect the accounts receivable of the Clinic. The Bank caused the memory portion of the computer system (i.e., the hard drive) to be completely erased, thus obliterating the information contained therein. After this erasure, the computer system was sold.

On October 31, 2000, Dr. Hoyt filed a petition for relief under Chapter 7 of the Bankruptcy Code. Dr. Hoyt listed the Bank as a creditor holding a secured claim. On January 30, 2001, Bank filed this adversary proceeding seeking to hold the obligations of Dr. Hoyt to the Bank non-dischargeable under § 523(a)(2), (4) and/or (6) of the Bankruptcy Code.[8]

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," such items are incorporated herein by this reference.

### Conclusions of Law

*§ 523(a)(2)(A)*

The Bank seeks a determination that the obligations of Dr. Hoyt to the Bank under his guaranties are non-dischargeable under § 523(a)(2)(A). That section excepts from discharge any debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

§ 523(a)(2)(A). In order to prevail under this section, a creditor must establish each of the following elements by a preponderance of the evidence:

(1) That a representation was made by the debtor;

---

**7.** Although unclear, it appears that the Court was not provided with all of the correspondence between the parties. The Bank's May 20, 2001, letter refers to a letter from Dr. Hoyt received by the Bank on or about May 10, 2001. No such letter was offered or received into evidence.

**8.** The Bank has abandoned its claim for relief under § 523(a)(4).

(2) That the representation was false;

(3) That the representation was made with the intent to deceive the creditor;

(4) That the creditor relied upon the representation;

(5) That such reliance was justifiable; and

(6) That, as a result of such reliance, the creditor suffered loss.

*See In re Young,* 91 F.3d 1367, 1373 (10th Cir.1996) (hereafter *"Young"*); *see also Herrig, supra,* 217 B.R. at 895–6. Unless all of these elements are established by a preponderance of the evidence, the debt is dischargeable. The United States Supreme Court has adopted the same test, except that the reliance standard to be used is the less stringent subjective standard of "justifiable" reliance, rather than the objective standard of "reasonable" reliance. *Field v. Mans,* 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Notwithstanding the decision of the Tenth Circuit in *Young,* this Court will use the justifiable reliance standard set forth by the United States Supreme Court.

*Representation*

The Bank does not argue that Dr. Hoyt directly made any false representations to it. Instead, the Bank argues that Dr. Hoyt failed to disclose the following facts at the August 31, 2000, meeting:

(1) That Dr. Hoyt had entered into an agreement with Sparks Medical Clinic which would cause him to leave Chelsea;

(2) That Dr. Hoyt would not issue billings for services performed at the Clinic after August 31, 2000;

(3) That Dr. Hoyt had stopped making efforts to collect accounts receivable; and

(4) That Dr. Hoyt had concluded that the "pre-fire" receivables were uncollectible.

Bank contends that the failure to disclose the items listed above serves as a representation for purposes of § 523(a)(2)(A).

■ The United States Court of Appeals for the Tenth Circuit has held that Under Oklahoma law, " '[i]n determining whether there is a duty to speak, consideration must be given to the situation of the parties and matters with which they are dealing.' " *Thrifty Rent–A–Car Sys., Inc. v. Brown Flight Rental One Corp.,* 24 F.3d 1190, 1195 (10th Cir.1994) (quoting *Silk v. Phillips Petroleum Co.,* 760 P.2d 174, 179 (Okla.1988)). Those considerations may require either (1) an absolute positive duty to speak based on a fiduciary or similar duty, or (2) a duty to speak arising from a partial disclosure. *See Thrifty Rent–A–Car Sys.,* 24 F.3d at 1195. The second duty is imposed because the speaker is " 'under a duty to say nothing or to tell the whole truth. One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth.' " *Id.* (quoting *Deardorf v. Rosenbusch,* 201 Okla. 420, 206 P.2d 996, 998 (1949)); *see also Varn v. Maloney,* 516 P.2d 1328, 1332 (Okla.1973); *Ragland v. Shattuck Nat'l Bank,* 36 F.3d 983, 991–92 (10th Cir.1994); Okla. Stat. tit. 76, § 3 (Deceit may be found, inter alia, by the "suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."). So even in the absence of a fiduciary or similar relationship, the duty to speak often arises. *See Rag-*

*land,* 36 F.3d at 991–92; *Uptegraft v. Dome Petroleum Corp.,* 764 P.2d 1350, 1353–54 (Okla.1988).

*Okland Oil Co. v. Conoco, Inc.,* 144 F.3d 1308, 1324 (10th Cir.1998) (footnote omitted). Although the Court was unable to locate any Oklahoma case law on point, the general rule is that the relationship of debtor and creditor does not create a fiduciary relationship. *See Harrison v. Wahatoyas, L.L.C.,* 253 F.3d 552, 560 (10th Cir. 2001) (Colorado law); *North Central Kansas PCA v. Hansen,* 240 Kan. 671, 732 P.2d 726, 730 (Kan.1987) (Kansas law). The Bank has neither pled nor proven any extraordinary facts which would establish a fiduciary relationship between Dr. Hoyt and the Bank.[9] Therefore, in order to find that Dr. Hoyt had a duty to disclose information, the Court must find that he made a partial disclosure.

■ In the present case, the Court has concluded that Dr. Hoyt revealed his intention to leave Chelsea to the general public on or about August 20, 2000, and that Mr. Fraley had actual notice of the same. The Court also believes the testimony of Dr. Hoyt that he informed the Bank of his intention to leave prior to August 31, 2000. Accordingly, there was no misrepresentation made with respect to that fact. With respect to the alleged nondisclosures regarding the collection of accounts receivable, the record reflects that: (1) some receivables were collected after August 31, 2000, and (2) Dr. Hoyt informed the Bank that Ms. McCreary, the employee primarily responsible for billings and collections, had left the employ of the Clinic. With respect to the collectibility of the "pre-fire" receivables, the evidence indicates that the Bank was aware of the issue and discussed the collectibility of these receivables with Dr. Hoyt in the spring of 2000. There is no evidence to establish that the issue of the "pre-fire" receivables was directly raised at the August 31, 2000, meeting. The receivables generated after the fire were in excess of $212,965.85 as of August 31, 2000. This amount, if collected, would have gone far towards satisfaction of the Clinic's indebtedness. The Court does not find that the "pre-fire" receivables were a topic of discussion on August 31, 2000, or that Dr. Hoyt made any partial disclosures regarding the "pre-fire" receivables which necessitated a disclosure of Ms. Noble's conclusions.

■ The alleged non-disclosure of Dr. Hoyt's failure to generate bills after August 31, 2000, relates to statements of intention and/or future events. In order to be actionable under § 523, a "representation must be one of existing fact and not merely an expression of opinion, expectation or declaration of intention." *In re Schwartz & Meyers,* 130 B.R. 416, 423 (Bankr.S.D.N.Y.1991) (citations omitted); *see also Kuper v. Spar (In re Spar),* 176 B.R. 321, 327 (Bankr.S.D.N.Y.1994) (citations omitted). Thus, Dr. Hoyt's failure to disclose that he would not issue bills after August 31, 2000, does not rise to the level of a representation.[10]

*Falsity and Intent to Deceive*

The Bank is required to establish all of the elements under § 523(a)(2)(A) in order

---

9. Indeed, the fact that the Bank has abandoned its claim based upon § 523(a)(4) would indicate that the Bank does not believe that it could prove that a fiduciary relationship exists between the Bank and Dr. Hoyt.

10. The Court also notes that there is no evidence in the record to establish that Dr. Hoyt had made a conscious decision on August 31, 2000, to have the Clinic stop issuing bills. Absent the formulation of such an intent, it is difficult to see how Dr. Hoyt could have disclosed the same.

to prevail. In most cases, having determined that Dr. Hoyt failed to make an actionable representation, the inquiry of the Court would end. However, in order to assist the parties (as well as any court which may be called upon to review this case), a discussion of Dr. Hoyt's alleged intent to defraud is appropriate.

■ This Court has previously ruled in the context of credit card usage that, on the issue of intent to deceive, the Court must make a factual finding of the subjective intent of the debtor; i.e., at the time of the charges in question, did the debtor intend to repay them. *See Herrig, supra,* 217 B.R. at 897. The United States Court of Appeals for the Tenth Circuit has held that

> Section 523(a)(2)(A) applies to a debt for money obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...." *Id.* This section includes only those frauds involving moral turpitude or intentional wrong, and does not extend to fraud implied in law which may arise in the absence of bad faith or immorality.

*Black, supra,* 787 F.2d at 505 (citations omitted). Several other courts have noted that "intentional deceit is a critical note in the score" of determining fraud. *See In re Baietti,* 189 B.R. 549, 554 (Bankr.D.Me. 1995) (citation omitted); *see also In re Mones,* 169 B.R. 246, 254 n. 6 (Bankr. D.D.C.1994) (for purposes of § 523(a)(2), "debtor's conduct must involve moral turpitude or intentional wrong"); *see also In re Schmidt,* 70 B.R. 634, 639 (Bankr. N.D.Ind.1986). While there are several approaches used by courts to determine whether a debtor has made a representation with the intent to deceive a creditor, the Tenth Circuit has adopted the "totality of the circumstances" approach. *See In re*

*Young, supra,* 91 F.3d at 1375. Courts which have used this approach acknowledge the fact that rarely, if ever, will a debtor admit his or her intent to deceive while under oath. *See In re Eashai,* 87 F.3d 1082, 1090 (9th Cir.1996).

The Court finds that the Bank has failed to prove by a preponderance of the evidence that Dr. Hoyt possessed an intent to defraud the Bank. All of the parties were aware of the precarious financial condition of the Clinic and the obligations which it owed to the Bank (and which were guaranteed by Dr. Hoyt). The parties were aware of the February 1999 fire and the effect which it could have on collectibility of "pre-fire" receivables. As a guarantor, it was in the best interests of Dr. Hoyt to maximize the Clinic's collections, as every dollar collected reduced his personal exposure. There is no doubt in the Court's mind that the relationship between Dr. Hoyt and the Bank was strained in the last six months of 2000, and that the parties viewed each other with some degree of mutual mistrust. The existence of mutual mistrust does not establish an intent to deceive in the mind of Dr. Hoyt. The Court concludes that even if the Bank carried its burden with respect to the alleged misrepresentations, it has failed to prove an intent to defraud on the part of Dr. Hoyt.

*§ 523(a)(6)*

The Bank also seeks to prevent the discharge of the debt owed to it under § 523(a)(6) of the Bankruptcy Code, which provides in relevant part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity

§ 523(a)(6). The Bank contends that the failure of Dr. Hoyt to collect the Clinic's accounts receivable falls within the scope of § 523(a)(6). The Bank also contends that the depositing of proceeds in the Grand Lake Bank Account constitutes conversion for purposes of § 523(a)(6). The Court will examine each argument in turn.

■ The United States Supreme Court, in a unanimous opinion, has held that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Kawaauhau v. Geiger*, 523 U.S. 57, 64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (hereafter *"Geiger"*). After a thorough analysis of existing case law (which will not be repeated herein), Judge Boulden concluded that

> . . . the definition of willful and malicious in the Tenth Circuit is now clear. In order for an act to be willful and malicious it must be a deliberate or intentional injury (willful) that is performed without justification or excuse (malicious).

*America First Credit Union v. Gagle (In re Gagle)*, 230 B.R. 174, 181 (Bankr. D.Utah 1999). As a result of *Geiger*, the standard under § 523(a)(6) has become extremely difficult to satisfy.

In the present case, the Clinic appears to have used its normal and customary procedures of billings and collections until early August of 2000, when Ms. McCreary left its employ. In September of 2000, as Dr. Hoyt continued to see patients, he continued to make notes on the medical files as to the procedures performed. Although those notes were never transformed into billing statements, there is no evidence that such statements could not have been generated. The Court finds that the Bank has failed to prove by a preponderance of the evidence that Dr. Hoyt acted maliciously when he failed to cause the Clinic to generate bills for services performed in the month of September, 2000.

The Court also fails to find any willful or malicious injury by Dr. Hoyt to the other receivables generated by the Clinic. To the extent the "pre-fire" receivables lost value due to the destruction of their supporting records in the fire, the fire was accidental and not a willful or malicious act of Dr. Hoyt. After Ms. McCreary left the Clinic, Dr. Hoyt made the decision to spend his remaining time at the Clinic treating patients. As he did so, although he failed to generate bills, there is nothing to indicate that he failed to prepare or destroyed any records necessary to create billings. After September 27, 2000, the Bank took possession of the Clinic's computerized records. The parties then appear to have engaged in a protracted dispute as to who was going to do what to collect the receivables. Interestingly enough, although the Bank requested the passwords to the computer system, there was no evidence that it ever requested a provider code from Dr. Hoyt or undertook any real effort to collect the receivables. The Court believes that the Bank bears much of the responsibility for the fact that the receivables languished and bears all of the responsibility for the ultimate destruction of the records which were on the Clinic's computer system. The fact that the receivables were ultimately not collected does not mandate a conclusion that Dr. Hoyt acted willfully and/or maliciously by failing to collect the same.

■ Bank also takes issue with the use of funds by the Clinic which were deposited in the Grand Lake Bank Account in the months of August, September and October of 2000 and contends that the deposit and later use of those funds constitutes a "willful and malicious" injury to the Bank's property for purposes of § 523(a)(6). The Court disagrees. The security agreement

between the Bank and the Clinic allows the Bank to waive the right of turnover of collateral and gives the Bank the discretion to allow the debtor (in this case, the Clinic) to use collateral proceeds. The evidence before the Court indicates that the Bank had a long-established practice of allowing the Clinic to use proceeds of accounts receivable to operate on. *See Plaintiff's Exhibit 11.*[11] Even though the Bank cautioned Dr. Hoyt about the deposit of funds in the Grand Lake Bank Account, it did not require him to account for or make up the funds that were expended prior to the August 31, 2000, meeting. The fact that Dr. Hoyt's conduct may have violated the terms of the Security Agreement (assuming *arguendo* that it did) is not sufficient, standing alone, to support a finding of non-dischargeability under § 523(a)(6). *See National City Bank v. Wikel (In re Wikel),* 229 B.R. 6, 11 (Bankr. N.D.Ohio 1998) (" § 523(a)(6) requires more than just a knowing breach of contract.") (citation omitted).

The Bank's contention that it would not have allowed the use of the funds had they been deposited in the Bank is not supported by its conduct. The Bank continued to allow the Clinic to use proceeds of accounts receivable during the months of September, October and November 2000. *See Plaintiff's Exhibit 11.* Where the Bank has consented to the use of funds, said use can hardly be said to constitute a "willful and malicious" conversion of collateral. *See Florida Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson),* 220 B.R. 134, 138 (Bankr.M.D.Fla.1998) (citation omitted).

### Conclusion

The claims of the Bank against Dr. Hoyt are dischargeable in this bankruptcy case.

11. Indeed, it is difficult to imagine how the Clinic could have operated without the use of the accounts receivable. It did not have a

A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

line of credit loan with the Bank; its only source of cash flow appears to have been the accounts receivable.