**F I L E D**
United States Court of
Tenth Circuit

**JUN 14 2001**

**PATRICK FISH**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

DWIGHT A. HARRISON,

        Plaintiff - Appellant,

  v.

WAHATOYAS, L.L.C., a Colorado
limited liability company; FIRST
BANK, FSB,

        Defendants - Appellees,

    and

GRANDOTE INTERNATIONAL
LIMITED LIABILITY COMPANY, a
Colorado limited liability company;
U.S. BANK NATIONAL
ASSOCIATION; GRANDOTE GOLF
AND COUNTRY CLUB, a Colorado
general partnership; DWIGHT A.
HARRISON CORPORATION, a
Colorado corporation; DAVID F.
JONES, an individual; CHARLES
HARRISON; JOHN P. HARRISON;
PAUL D. HARRISON,

        Defendants.

No. 99-1319

DWIGHT A. HARRISON,

     Plaintiff,

  v.

WAHATOYAS, L.L.C., a Colorado
limited liability company; FIRST
BANK, FSB,

     Defendants -Appellees,

  v.

CHARLES HARRISON, JOHN P.
HARRISON, PAUL D. HARRISON,

     Defendants - Appellants,

   and

GRANDOTE INTERNATIONAL
LIMITED LIABILITY COMPANY,
a Colorado limited liability company;
U.S. BANK NATIONAL
ASSOCIATION; GRANDOTE GOLF
AND COUNTRY CLUB, a Colorado
general partnership; DWIGHT A.
HARRISON CORPORATION, a
Colorado corporation; DAVID F.
JONES, an individual,

     Defendants.

No. 99-1390

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 94-WM-1505)**

---

Dianne M. Kueck (Chesley K. Culp, III, S. Kirk Ingebretsen with her on the briefs) Moye, Giles, O'Keefe, Vermeire & Gorrell, LLP, Denver, Colorado, for Appellants.

Stephen D. Bell of Dorsey & Whitney, LLP for First Bank, FSB and Laura B. Redstone of Ballard, Spahr, Andrews & Ingersoll, LLP for Wahatoyas, L.L.C. (Jessica L. Harshbarger, Dorsey & Whitney, LLP, Fredric J. Lewis, Senn, Lewis & Visciano, PC, and Harry L. Simon with them on the brief), Denver, Colorado, for Appellees.

---

Before **SEYMOUR**, **McKAY**, and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Appellants' predecessors in interest borrowed money from two banks to finance a golf course located in La Veta, Colorado.[1] After financial difficulties, appellants settled the inevitable ensuing litigation by paying off the loan to one of the banks. They contend that an agreement between the banks required distribution of the settlement proceeds to appellants' debts with both banks. When appellants learned that the settlement money had not been apportioned, they filed suit alleging breach of contract, breach of the duties of good faith and fair dealing, breach of fiduciary duty, constructive fraud, and negligence.

---

[1] This golf course spawned a great deal of litigation, including a related appeal in this Court. See Kojima v. Grandote Int'l L.L.C. (In re Grandote Country Club Co.), No. 99-1127 (10th Cir. 2001); see also In re Kojima, 177 B.R. 696 (Bankr. D. Colo. 1995); RTV, L.L.C. v. Grandote Int'l L.L.C., 937 P.2d 768 (Colo. Ct. App. 1996).

Appellants lost in all respects at the summary judgment stage and now appeal. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I

Before delving into the facts of this case, we note that this appeal is significantly complicated by the fact that each party has gone through several incarnations. To assist the reader, each row in the following chart lists a party, with the parties' name changes shown by moving from left (earliest in time) to right (most recent). We refer to appellants collectively as "Grandote" and the other parties by the names applicable to the time period under discussion.

| Plaintiffs-Appellants | Grandote Golf and Country Club | Dwight Harrison (succeeded to Grandote Golf and Country Club's interest in Jan. 1991) | Grandote International L.L.C. (succeeded to Dwight Harrison's interest in Sept. 1993; managed by the Harrison family: father Dwight and sons Charles, John, and Paul) | |
|---|---|---|---|---|
| Defendant-Appellee | First Federal Savings and Loan Association of Estherville and Emmettsburg ("Emmettsburg") | Resolution Trust Corp. ("RTC") (receiver for Emmettsburg in June 1990) | Wahatoyas L.L.C. (acquired RTC's interest in Emmettsburg) | |
| Third Party Defendant-Appellee | Washington Federal Savings Bank ("Washington") | Metropolitan Federal Bank of Iowa ("Metropolitan") | First Bank, FSB (acquired Metropolitan in Feb. 1995) | U.S. Bank National Association (acquired First Bank) |

In the mid-1980s, Grandote owned a piece of land and water rights in Huerfano County, Colorado. To develop a golf course and residences on the land, Grandote borrowed money from two banks in 1984: $4 million from Washington, which was secured by a first lien on the land, and $500,000 from Emmettsburg, which was secured by a second lien on the land and a first lien on the water rights. By 1987, Grandote needed more cash to complete the golf course and sought additional financing from Washington. As a condition of receiving additional credit ("the revolving loan"), Grandote gave Washington authority to arrange with Emmettsburg any modifications to the Emmettsburg loan that Washington believed necessary to provide adequate security for the new revolving loan. Pursuant to that authority, Washington and Emmettsburg entered into the "Emmettsburg Agreement," which provided that "[a]ll collections received by either Washington or Emmettsburg on account of the Washington Loan or the Emmettsburg Loan shall be shared pro rata by the parties," with 13.878% going to Emmettsburg and the remaining 86.122% going to Washington. (I R. Doc. 179 Ex. 2 ¶ 5.) The parties dispute whether Grandote was aware of this agreement, although it is undisputed that Grandote was not a party to it.

Life on the links was not all bliss, and Grandote suffered financial setbacks leading to litigation involving Grandote and Washington's successor in interest, Metropolitan, regarding payment of Grandote's loans. That litigation was settled by means of a "Settlement Stipulation," (Id. Ex. 4), which, after further

negotiations, was modified by a "Payment and Release Agreement," (II R. Doc. 316 Ex. 1). Pursuant to those agreements, Grandote paid Metropolitan $1.95 million to resolve the litigation and pay off the Washington/Metropolitan loans.

In September 1993, RTC, which had become the receiver for Emmettsburg, initiated foreclosure proceedings on the Emmettsburg loan. Grandote attempted to pay off the outstanding balance on the loan. Now aware of the Emmettsburg Agreement, Grandote interpreted the "all collections" provision as applying to the settlement proceeds Grandote had paid to Metropolitan and reasoned that 13.878% of its $1.95 million payment to Metropolitan should have been applied to the Emmettsburg Loan. Grandote subtracted this amount (roughly $270,000) from the outstanding loan balance and tendered the remaining amount due on the loan (just under $58,000) to RTC. RTC refused this tender because Metropolitan had not given any of the settlement proceeds to RTC. Grandote viewed this as a breach of the Emmettsburg Agreement and sued RTC. Wahatoyas[2] acquired RTC's interest in the Emmettsburg loan and was substituted for RTC in the action. Metropolitan (whose interests were acquired by First Bank, and then by U.S. Bank) was brought in as a third-party defendant on the theory that if

_____

[2] "Wahatoyas," a phonetic spelling of a plains Indian word, refers to the "geologic anatomy" of the area currently known as the Spanish Peaks located in the vicinity of the property. See Louis B. Sporleder, Sr., The Romance of the Spanish Peaks 9 (1960).

-6-

Grandote prevailed, then RTC/Wahatoyas would seek contribution from Metropolitan/First Bank/U.S. Bank.

We need not detail the complex nature of the proceedings below except to note that they were initially filed in Colorado state court and then removed to federal court, and that the district court granted summary judgment against Grandote on all claims.

## II

Before we reach the merits, an unusual procedural issue requires our attention. The notice of appeal naming Grandote L.L.C. as a party to this appeal was filed, pro se, by Dwight Harrison and was later amended to include Dwight's sons, Charles, John, and Paul. Harrison is not an attorney, and no attorney ever filed a notice of appeal on behalf of Grandote L.L.C. Wahatoyas and U.S. Bank argue that the notice of appeal was deficient as to Grandote L.L.C.

As a general matter, a corporation or other business entity can only appear in court through an attorney and not through a non-attorney corporate officer appearing pro se. See Flora Constr. Co. v. Fireman's Fund Ins. Co., 307 F.2d 413, 414 (10th Cir. 1962) ("The rule is well established that a corporation can appear in a court of record only by an attorney at law."). In this case, however, only the notice of appeal was filed by a non-attorney, and Grandote now has counsel who have performed all of the substantive legal work.

-7-

The Ninth Circuit recently addressed the issue of "whether a corporation's notice of appeal, signed and filed by a corporate officer, is invalid because it was not signed and filed by counsel." Bigelow v. Brady (In re Bigelow), 179 F.3d 1164, 1165 (9th Cir. 1999). The court concluded that the notice was valid because "[a] notice of appeal is just that—a notice. It is not a motion or a pleading." Id. (citing Fed. R. Civ. P. 7); cf. Becker v. Montgomery, No. 00-6374, slip op. at 9-10 (U.S. May 29, 2001) ("[I]mperfections in noticing an appeal should not be fatal where no genuine doubt exists about who is appealing, from what judgment, to which appellate court."). The First Circuit reached the same conclusion in a case citing Bigelow. Instituto de Educación Universal Corp. v. United States Dep't of Educ., 209 F.3d 18, 22 (1st Cir. 2000) ("[W]e believe that a valid distinction can be drawn between ongoing legal representation and the essentially ministerial action involved in the filing of a notice of appeal.").

We find the reasoning of these cases persuasive and thus "fail to see any compelling reason to refuse to recognize a corporation's notice of appeal, signed and filed by a corporate officer, so long as a lawyer promptly thereafter enters a formal appearance on behalf of the corporation and undertakes the representation." Bigelow, 179 F.3d at 1165. Appellees argue that Bigelow requires a lawyer to "promptly" enter an appearance after the notice of appeal, a requirement they claim Grandote failed to observe because Grandote's counsel did not enter an appearance until eight months after the notice of appeal was filed.

We disagree. Grandote retained counsel in time to perform the necessary substantive legal work (i.e., briefing and oral argument). Under these circumstances, we hold that Grandote L.L.C. is a proper party. See id. at 1165–66 ("[C]ounsel for [appellant] entered his appearance of record prior to the time any briefs, motions or responses were due . . . [and] filed the brief, responded to the motions and argued the case. Under the circumstances, we hold that the notice of appeal was not invalid . . . ."); Instituto de Educación Universal, 209 F.3d at 22 (holding that a corporate appellant was a proper party because it retained counsel "to take up the cudgels and prosecute the appeal").

### III

"We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court . . . ." Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996) (citation omitted). That standard is set forth in Fed. R. Civ. P. 56(c): Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a summary judgment motion, the court is to view the record "in the light most favorable to the nonmoving party." Thournir v. Meyer, 909 F.2d 408, 409 (10th Cir. 1990) (citation omitted). The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a

party's factual claims. Unsupported conclusory allegations thus do not create a genuine issue of fact. See United States v. Simons, 129 F.3d 1386, 1388–89 (10th Cir. 1997) (citing Allen v. Muskogee, Okla., 119 F.3d 837, 843–44 (10th Cir. 1997)). To withstand summary judgment, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

## A. Breach of Contract

The district court provided several alternative reasons for granting summary judgment in favor of Wahatoyas on Grandote's breach of contract claim.[3] We need not discuss all of these reasons because we can affirm on the basis of one. See Griffin v. Davies, 929 F.2d 550, 554 (10th Cir. 1991) ("We will not undertake to decide issues that do not affect the outcome of a dispute.").

The district court held that Grandote's contract claim was barred by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C.

---

[3] The district court held that: (1) The Settlement Stipulation terminated the Emmettsburg Agreement (and thus any obligation to pay 13.878% toward the Emmettsburg loan); (2) Grandote was not a third party beneficiary of the Emmettsburg Agreement; and (3) Grandote's claim failed under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1823(e), and the doctrine of D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942), both of which impose requirements on agreements that diminish a receiver's (i.e., RTC's) interests in a bank's assets.

§ 1823(e) ("FIRREA"),[4] and the doctrine of D'Oench, Duhme & Co. v. FDIC, 315

U.S. 447 (1942). "The common law D'Oench doctrine and its statutory

codification, 12 U.S.C. § 1823, prohibit claims based on agreements not reflected

in the official records of a failed bank or savings and loan institution." FDIC v.

Noel, 177 F.3d 911, 914 (10th Cir. 1999), cert. denied, 528 U.S. 1116 (2000).

The "purpose underlying the D'Oench doctrine [is] to 'permit regulators to

accurately appraise the assets of savings institutions by allowing the regulators to

rely on the assets' face value,'" and the doctrine's focus is on "'the effect the

[debtor's] acts have on the regulatory agency's ability to evaluate quickly and

accurately a savings institution's assets.'" Id. at 918 (quoting Castleglen, Inc. v.

Resolution Trust Corp., 984 F.2d 1571, 1576, 1577 (10th Cir. 1993)).

---

[4] Title 12 U.S.C. § 1823(e) states:

(1) In general
No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
(A) is in writing,
(B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
(C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(D) has been, continuously, from the time of its execution, an official record of the depository institution.

-11-

Grandote contests application of FIRREA and the D'Oench doctrine on several fronts. First, Grandote claims that Wahatoyas is not entitled to bring the FIRREA/D'Oench defense because Wahatoyas waived it. Wahatoyas initially asserted the defense but later withdrew it, and the defense was not a part of the original pretrial order. Realizing that the defense actually did have merit, Wahatoyas changed its mind again and successfully moved the district court to amend its answer to include the defense. The district court's decision is reviewed for abuse of discretion. See TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992). Given this standard of review and the fact that the D'Oench defense is a purely legal one that would require little, if any, additional discovery, we will not disturb the district court's sound discretion to manage the scope of the issues of this case.

Grandote next attacks the applicability of FIRREA because that statute does not apply retroactively, see Okla. Radio Assocs. v. FDIC, 987 F.2d 685, 690 (10th Cir. 1993), and thus can have no effect on the Emmettsburg Agreement, which was signed two years before FIRREA was enacted. Wahatoyas argues that FIRREA should apply because Grandote's claim arises from the Settlement Stipulation, which was signed after the statute's effective date. We agree with Grandote that the relevant agreement is the Emmettsburg Agreement and thus FIRREA does not apply. Most importantly, the Emmettsburg Agreement, with its sharing provision, is the key document that would affect Wahatoyas's interests.

-12-

In addition, Wahatoyas's argument is self-defeating. If the Settlement Stipulation were the relevant document, Wahatoyas could not rely on FIRREA because the Settlement Stipulation appears to satisfy FIRREA's requirements—the Settlement Stipulation is written, and Grandote is a party to it. See 12 U.S.C. § 1823(e)(1)(A)–(B).

Even without FIRREA, the common law D'Oench doctrine is broad enough to defeat Grandote's claim. See Noel, 177 F.3d at 917 ("[W]e may affirm the district court's grant of summary judgment if § 1823(e)'s common law counterpart, the D'Oench doctrine, bars [the] claim."). Grandote's breach of contract claim is premised on an adverse interest to Wahatoyas (the successor to the receiver, RTC) by means of the Emmettsburg Agreement. Grandote was not a party to that agreement. As a result, although "the Emmettsburg Agreement was in the bank's files, that agreement . . . provided no indication on its face that Grandote or D[wight] Harrison, neither of which was a signatory, could claim its benefits." (Appellees' Br. at 37.) Perhaps a close and careful study of the Emmettsburg Agreement might have alerted RTC to a potential claim. Nevertheless, the D'Oench doctrine does not require so much of bank examiners. As we explained in Noel:

> Given the overarching purposes behind the doctrine, courts have consistently held that inferences that an examiner could feasibly draw from a failed institution's written records are insufficient to preclude the operation of D'Oench. . . . In short, the [receiver] has no duty to scour a failed institution's documents for inferences and

-13-

> hidden duties supporting defenses or counterclaims that might prevent the [receiver] from collecting the full value of an otherwise facially valid instrument.

177 F.3d at 918 (citations omitted). The Emmettsburg Agreement was not clearly written to benefit Grandote, and the D'Oench doctrine prohibits Grandote from enforcing it against Wahatoyas.

## B. Breach of the Duties of Good Faith and Fair Dealing, Breach of Fiduciary Duty, and Negligence[5]

The parties disagree about whether Grandote's claim for breach of good faith and fair dealing is properly considered a tort or a contract claim. To the extent that it is a tort claim, as the district court concluded, it must fail under Colorado law. See Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc., 872 P.2d 1359, 1362 (Colo. Ct. App. 1994) (holding that there is no independent tort action for breach of implied duty of good faith and fair dealing outside of the insurance carrier context). The result is the same even if the claim is construed as arising under contract because there is no allegation that the Emmettsburg Agreement was breached in a way that harmed Grandote's benefits from the agreement. Grandote claims it is a third-party beneficiary of the Emmettsburg

---

[5] Grandote also alleged constructive fraud below but has failed to argue that summary judgment on that claim was erroneous. Grandote has thus waived its appeal of that claim. See Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 624 (10th Cir. 1998) ("[A]rguments not set forth fully in the opening brief are waived.").

Agreement because the agreement permitted Grandote to obtain the revolving loan and lower interest rates on its loan with Emmettsburg. Neither of these benefits was affected by U.S. Bank's failure to distribute part of the settlement monies to Wahatoyas. There was no violation of the covenant of good faith and fair dealing because Grandote got what it expected out of the Emmettsburg Agreement. See id. at 1363 (noting that the duty of good faith "requires only that the parties perform in good faith the obligations imposed by their agreement"); Ervin v. Amoco Oil Co., 885 P.2d 246, 251 (Colo. Ct. App. 1995), rev'd in part on other grounds, 908 P.2d 493 (Colo. 1996) (noting that good faith implicates "consistency with the justified expectations of the other party" (citation omitted)).

Summary judgment was also appropriate on the fiduciary duty and negligence claims. There is no per se fiduciary duty between a borrower and a lender. See Wells Fargo Realty Advisors, 872 P.2d at 1364–65. Grandote has offered nothing more than conclusory allegations to support a fiduciary relationship. Regarding the negligence claim, Grandote has similarly failed to identify a specific duty applicable under the facts of this case that Wahatoyas has breached. While banks certainly have a duty to keep track of their customers' money, see, e.g., Central, Inc. v. Cache Nat'l Bank, 748 P.2d 351, 354 (Colo. Ct. App. 1987), we fail to see how that generalized duty leads to the much more specific and onerous obligation Grandote posits—namely, requiring Wahatoyas to

fight another bank for money under a settlement agreement to which Wahatoyas was not a party.

## C.  Indemnification

The district court ruled that the Payment and Release Agreement obligated Grandote to indemnify U.S. Bank for the claims arising out of this litigation. Grandote contends that the indemnification clause is inapplicable because this action does not concern either the "Property" or the "Settlement" as those terms were used in the Payment and Release Agreement.

We see no error in the district court's determination.  The indemnification clause in the settlement agreement is broad:  it encompasses "any . . . claim and demands made . . . in connection with the Property or the Settlement Agreement." (II R. Doc. 206 Ex. 5 at 2–3.)  Despite Grandote's arguments to the contrary, this litigation certainly is "in connection with . . . the Settlement Agreement" because all of Grandote's claims concern the proper distribution of the payment Grandote made pursuant to that agreement.  The purpose of the indemnification clause was to protect Metropolitan/U.S. Bank from further costs associated with settling its dispute with Grandote.  The instant lawsuit has forced Metropolitan/U.S. Bank to become involved in yet more litigation, the outcome of which could cost U.S. Bank nearly $300,000.  This is exactly what the plain language of the Settlement Agreement was intended to avoid.

## IV

The judgment of the district court is **AFFIRMED**.