Floyd BURNS and George
Cole, Plaintiffs,

v.

REALNETWORKS, INC., Defendant

v.

Floyd Burns, George Cole, and
Surestream, Inc., Counter-
claim Defendants.

No. CIV–03–1501–C.

United States District Court,
W.D. Oklahoma.

Dec. 30, 2004.

Floyd Burns, Oklahoma City, OK, Pro Se.

George Cole, Oklahoma City, OK, Pro Se.

Anton J. Rupert, Mack J. Morgan, III, Marie S. Johnston, Phillip L. Free, Jr., Crowe & Dunlevy–OKC, Oklahoma City, OK, Jeffrey J. Look, Look Law Firm, Plano, TX, for Defendant.

## ORDER

CAUTHRON, District Judge.

Before the Court are three motions, the resolution of which completely disposes of this action: (1) Plaintiffs' and Counterclaim Defendants' Motion for Summary Judgment (Dkt. No. 71); (2) Defendant's Motion for Summary Judgment (Dkt. No. 74); and (3) Defendant's Motion to Dismiss Without Prejudice (Dkt. No. 83).

### BACKGROUND

This case centers primarily around who is the rightful owner of the trademark name, "SureStream." Counterclaim Defendant, SureStream, Inc., began using the SureStream name in July 1998, by registering the domain names, *www.SureStream.Com* (SureStream.Com) and *www.SureStream.Net* (SureStream.Net)

and connecting these domain names with websites containing information that may be viewed by the public.[1] The domain names were registered on July 14, 1998, and were active no later than July 24, 1998[2] (Network Solutions Domain Name Registration Records, Def.'s Resp. to Pls.' Mot. for Summ. J. Exh. 1; Burns TTAB Filing, Def.'s Resp. to Pls.' Mot. for Summ. J. Exh. 4).

At the top left of the SureStream.Net website, the words "SureStream Inc." were written in light-colored cursive letters set against a dark background (July 23, 1998, version of SureStream.Net, Pls.' Mot. for Summ. J. Exh. A(1)). Immediately to the right was the slogan, "Web Hosting, Design, And Search [Engine][3] Services" (*id.*). Underneath this "header," the page is divided into two columns (*id.*). The text in the left column identified the services provided by SureStream, Inc., as: website design; hosting; and search submission and promotion (*id.*). Appearing in the right column are three paragraphs describing and promoting SureStream, Inc., and its services (*id.*). Finally, at the bottom of the right column was an email link to *Webmaster@SureStream.Com.* (*id.*).

The layout of the SureStream.Com website was quite different from that of SureS-

---

1. Apparently on October 27, 2003, the Plaintiffs acquired whatever ownership SureStream, Inc., had in the mark "SureStream" from SureStream, Inc., and then licensed the mark back to SureStream, Inc., the next day (*see* Defs.' Mot. for Summ. J. Undisputed Fact ¶ 5; License Agreement, Pls.' Resp. to Def.'s Mot. for Summ. J. Exh. 3). Therefore, for purposes of this motion, the Court treats Plaintiffs and SureStream, Inc., as one and the same and uses the terms "Plaintiffs" and "SureStream, Inc." interchangeably.

2. The actual date the websites became available to the public is disputed. Plaintiff Floyd Burns (Burns) testified that the websites were created in June and simply uploaded on July 14 when the domain names became active (Burns Aff., Pls.' Mot. for Summ. J. Exh. A at

61–62). However, in his letter of opposition to the Assistant Commissioner for Trademarks, Burns stated that the "search engine SureStream.Com was on the Internet available for use on July 24, 1998" (Burns TTAB Filing, Def.'s Resp. to Pls.' Mot. for Summ. J. Exh. 4). The printouts of the original websites attached to Burns' affidavit are date-stamped 7/23/98 (July 23, 1998, versions of SureStream.Com and SureStream.Net, Pls.' Mot. for Summ. J. Exh. A(1) & (2)). Although disputed, this fact is not material as explained *infra*.

3. The text on the right-hand side of this webpage was cut off of the copies provided to the Court; therefore, the Court is merely assuming that the missing word is "Engine."

tream.Net (*see* July 23, 1998, version of SureStream.Com, Pls.' Mot. for Summ. J. Exh. A(2)). At the top middle of the page appeared the words, "SureStream.Com" written in cursive (*id.*). Immediately below is what appears to be a slogan or tagline, "Internet Search and Services" (*id.*). Appearing approximately three-quarters of an inch below these lines are the following items, in order: (1) a title line in small print reading "SureStream Web Hosting and Design;" (2) featured links to several stock market sites; (3) a search engine "form;" (4) a link for viewers to use if they want to add their websites to the SureStream.Com search; (5) an advertisement for link exchange; (6) a search link to amazon.com; (7) links to other search engines; and (8) an email link to the *webmaster@SureStream.Com* (*id.*).

On August 3, 1998, Defendant RealNetworks, Inc. (RealNetworks) filed an intent-to-use trademark application pursuant to 15 U.S.C. § 1051(b) (RealNetworks' Trade/Service Mark Application, Def.'s Resp. to Pls.' Mot. for Summ. J. Exh. 10). RealNetworks' application was to use the "SureStream" mark "in connection with computer software that allows the encoding, transmitting and receiving of streaming media over local and global networks" (*id.*). The users of this software could be businesses, government agencies, universities, or individuals on the Internet watching media content (Prock Deposition, Pls.' Mot. for Summ. J. Exh. G. at 51). RealNetworks began using the "SureStream" mark on its software in September 1998 (Pls.' Br. in Support of Pls.' Mot. for Summ. J. at 13).

Prior to filing its trademark application, RealNetworks hired Thomson & Thomson to conduct a trademark availability search (Thomson & Thomson Trademark Research Report, Def.'s' Mot. for Summ. J. Exh. 15 at RN–271). The search did not identify anyone using the "SureStream" mark (*id.* at RN–275). Indeed, the search revealed that, as of July 22, 1998, no existing domain names were registered under the "SureStream" name (Thomson & Thomson Trademark Research Report, Def.'s Mot. for Summ. J. Exh. 16 at RN–386). The invoice for the report was dated July 29, 1998, and was stamped "Received" on August 4, 1998 (Receipt for Research Report Receipt, Def.'s Mot. for Summ. J. Exh. 16).

Shortly after filing its trademark application, RealNetworks learned that the domain names SureStream.Com and SureStream.Net existed (Prock Deposition, Pls.' Mot. for Summ. J. Exh. G at 38). Upon learning this, Bill Way (Way), RealNetworks' associate general counsel, sent an email to the *webmaster@SureStream.Com* (August 14, 1998, Bill Way email, Pls.' Mot. for Summ. J. Exh. A(14)). In the email, Way expressed his concern that visitors to SureStream, Inc.'s websites may be confused about whether there was a connection between the websites and RealNetworks' products and he requested someone call him to discuss the situation (*id.*). Plaintiff Floyd Burns (Burns) responded by calling Way (Pls.' Mot. for Summ. J. Undisputed Fact ¶ 15). During this and subsequent conversations, Way requested that SureStream, Inc., place disclaimers on its websites indicating that the sites were not affiliated with RealNetworks (*id.*). Burns refused this request and informed RealNetworks that the name "SureStream" belonged to SureStream, Inc., and that RealNetworks was not to use it (Burns Deposition, Pls.' Mot. for Summ. J. Exh. A at 154).

On June 29, 1999, the "SureStream" mark was published for opposition (Pls.' Mot. for Summ. J. Undisputed Fact ¶ 8). SureStream, Inc., filed a *Notice of Opposition* with the Trademark Trial and Appeal Board (TTAB) on August 25, 1999 (*id.*).[4]

---

4. The exhibit presented by Plaintiffs is not the actual Notice of Opposition, but rather a let-

The resulting opposition proceeding was suspended after Plaintiffs filed this action (Pls.' Mot. for Summ. J. Undisputed Facts ¶ 17).

The SureStream.Com website has undergone several significant modifications since SureStream, Inc., learned of RealNetworks' application. In December 2000, SureStream.Com displayed several links to MP3 and other music sites, a search engine, and featured links (December 4, 2000, version of SureStream.Com, Def.'s Resp. to Pls.' Mot. for Summ. J. Exh. 9). One of the "Featured Links" is Real.com, the website for Defendant, RealNetworks, Inc. (*id.*). The 2000 version listed "Internet Search, Music, and More!" as its tagline (*id.*). Nowhere on the site does it speak about website design or hosting services or offer an email link to the site's webmaster (*id.*).[5] By 2002, the SureStream.Com website boasted itself as, "Your Source for Streaming Media" and offered links to sites that streamed news, radio, and television broadcasts via the Internet (August 21, 2002, version of Sur-

eStream.Com, Pls.' Mot. for Summ. J. Exh. A(3)).

In contrast, the SureStream.Net website continued to advertise web hosting, design, and search submission services consistent with those originally offered on this site (*see* June 16, 2000, version of SureStream.Net, Pls.' Resp. to Def.'s Mot. for Summ. J. Exh. 2(B)). In addition, however, the SureStream.Net site hosted a few websites. In 2001, it hosted a site called "E–Com Central" (Pls.' Resp. to Def.'s Mot. for Summ. J. Exh. 2 ¶ 6). Additionally, in 2002, the SureStream site hosted websites for AXAS, a mortgage lender, and Soccermate, a sporting goods electronic retailer (*id.*).

Notwithstanding these changes, the SureStream.Com and SureStream.Net websites have not generated any income (Def.'s Mot. for Summ. J. Undisputed Fact ¶ 4[6]). Burns testified that when the websites first went up, no one came to visit the sites (except him) or knew they existed (Burns Dep., Defs.' Mot. for Summ. J. Exh. 5 at 69).[7] Burns indicates that to attract traffic to the websites, he needed to

---

ter to the Assistant Commissioner for Trademarks signed by Floyd Burns alone, opposing RealNetworks' application (Burns April 13, 1999, letter, Pls.' Mot. for Summ. J. Exh. E). Further, the letter does not indicate whether he is opposing RealNetworks' application as an individual or on behalf of SureStream, Inc. (*id.*). However, Plaintiffs' Undisputed Facts 8 and 17 indicate it was SureStream, Inc., that filed the Notice of Opposition and that it was filed on August 25, 1999 (*see* Pls.' Mot. for Summ. J. Undisputed Facts 8 & 17). As these facts were not denied by RealNetworks, the Court accepts, for purposes of this motion, that the Notice was filed on August 25, 1999, by SureStream, Inc. *See* LCvR56.1(c).

5. Floyd Burns testified that he had removed this link because of the number of persons contacting him regarding problems with RealNetworks' RealPlayer using SureStream technology (Floyd Burns Affidavit II, Pls.' Resp. to Def.'s Mot. for Summ. J. Exh. 2 ¶ 4).

6. Defendant's Undisputed Fact ¶ 4 includes multiple statements of facts. In their Re-

sponse, Plaintiffs and Counterclaim Defendants deny some of these statements and fail to deny others. Therefore, according to Local Rule 56.1, those facts not specifically denied are deemed admitted. LCvR56.1(c).

7. Burns now attempts to deny this testimony by (1) stating that he really had no way of knowing who, if anyone, came to the site, as the site does not require identification nor did it have a counter, and (2) presenting evidence showing that over the past fifteen months, the SureStream.Com website had an average of 5,043 hits per month and by suggesting that this evidence is probative to the number of visitors when the website initially became active (Burns Affidavit II, Pls.' Resp. to Def.'s Mot. for Summ. J. Exh. 2 ¶ 3). However, Burns unequivocally testified in his deposition that "no one came to the site," not that he didn't know who or how many persons visited the site (*compare* Burns Dep., Def.'s Mot. for Summ. J. Exh. 5 at 69 *with* Burns Affidavit II, Pls.' Resp. to Def.'s Mot. for Summ. J. Exh. 2 ¶ 3). Further, the website user data for the last fifteen months is not probative of the

secure prominent placement with the major search engines (*id.*). However, he was unable to secure such placement because of RealNetworks "[taking] over all the spaces on the search engines" (*id.*).

Plaintiffs' primary method of advertising the sites was through barter and trade (Burns Affidavit II, Pls.' Resp. to Def.'s Mot. for Summ. J. Exh. 2 ¶ 8). Specifically, SureStream.Com participated in a link exchange service where SureStream.Com hosted a link to another's website and the other party similarly hosted a link to the SureStream.Com website (*id.*). Ultimately, however, according to Plaintiff George Cole (Cole), they haven't made any money because they "never made a mouse trap that would sell" (Cole Dep., Def.'s Mot. for Summ. J. Exh. 9 at 91).

Plaintiffs alleged that they have received emails from Internet users confusing their services with that of RealNetworks. On December 31, 2000, Terry Kline from the University of Wisconsin emailed SureStream, Inc., inquiring into whether SureStream, Inc., was the same as the SureStream listed on the bottom of his RealPlayer [8] (Terry Kline Dec. 31, 2000, email, Pls.' Mot. for Summ. J. Exh. A(15)). Plaintiffs received two similar emails in the past few weeks, both from customers having trouble with their Real-Player (*see* Balbi & Karioth emails, Pls.' Resp. to Def.'s Mot. for Summ. J. Exhs. 13–14).

### LEGAL STANDARD

Summary judgment is proper only if the moving party shows "there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *See Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Willis v. Midland Risk Ins. Co.,* 42 F.3d 607, 611 (10th Cir.1994).

When deciding whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Simms v. Oklahoma ex rel. Dep't of Mental Health,* 165 F.3d 1321, 1326 (10th Cir. 1999). The Court may consider as evidence the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed. R.Civ.P. 56(c). The Court will not consider unsupported, conclusory allegations. *See Harrison v. Wahatoyas, L.L.C.,* 253 F.3d 552, 558 (10th Cir.2001).

### DISCUSSION

. Both Plaintiffs and Defendant have alleged a claim against the other for false designation of origin under 15 U.S.C.

---

number of visitors during the first few weeks after the websites became active, especially in light of the number of changes SureStream.Com has undergone since its inception.

8. RealPlayer is the device that uses the SureStream software/technology to stream media via the Internet and other networks. (Def.'s'

Br. in Response to Pls.' Mot. for Summ. J. at 19–20) RealNetworks permits Internet users to download their RealPlayer for free so that they can watch video or listen to music over the Internet (*id.*). Companies then purchase the SureStream software, allowing them to stream their materials over the Internet to the users with RealPlayer (*id.*).

§ 1125(a) (Lanham Act). The Lanham Act provides a cause of action against any party who:

> in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . , which-
> (A) is likely to cause confusion, or to cause mistake, or to deceive as the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

15 U.S.C. § 1125(a)(1). To prevail on a Lanham Act infringement claim, the claimant must prove: (1) that it had prior legal rights to the mark; and (2) that there is a likelihood of confusion between its mark and the allegedly infringing mark. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768–69, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).[9]

*A. Plaintiffs' Trademark Infringement Claims*

■ The first party to adopt and use a mark in commerce obtains ownership rights in the mark. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918). Trademark rights are not acquired as of the date the mark is merely adopted, but rather when the mark is actually used in commerce. 3 Callman on Unfair Competition., Tr. & Mono. § 20:1 (4th ed.). An application to register a mark is construed as constructive use of the mark, giving the applicant priority of usage against everyone but a prior user. 15 U.S.C. § 1057(c).

■ RealNetworks filed its intent-to-use application on August 3, 1998. Plaintiffs have never filed such an application. Therefore, unless Plaintiffs "used" the SureStream mark in commerce prior to August 3, 1998, thus acquiring common-law rights to the mark, the mark is owned by RealNetworks.

■ The Lanham Act defines "use in commerce" as:

> the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark . . . [A] mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce.

15 U.S.C. § 1127. The use of the disjunctive "or" between "sale or advertising of services" signifies that trademark rights may accrue when the services are advertised in commerce and an actual sale of the services is unnecessary to acquire trademark rights.[10] Therefore, the fact that

---

9. Both parties have also asserted claims under Oklahoma's Uniform Deceptive Trade Practices Act, 78 Okla. Stat. § 51, et seq. However, because the standard for determining violations under this statute appears to be consistent with that under the Lanham Act, the Court's analysis under the Lanham Act applies with equal force to that under the Uniform Deceptive Trade Practices Act. *See Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 976 (10th Cir.2002).

10. The Tenth Circuit has not expanded upon the definition of "use in commerce." RealNetworks urges the Court to apply the Third Circuit's test from *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311 (3d Cir.

1999), which looks at: "(1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." *Id.* at 317 (quoting *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398–99 (3d Cir.1985)). In contrast, the Sixth Circuit does not focus on the sales of the particular goods or services, but instead looks at: (1) the intent of the party in using the mark: was the use of the mark disingenuous—i.e. a defensive use or merely a "premarketing maneuver," or an actual and sincere use of the trademark?; (2) whether the use was suffi-

Plaintiffs had not sold any of their services prior to August 3, 1998, is not fatal to their claim. However, their "use in commerce" through advertising alone must be "sufficiently public to identify or distinguish the [services] in an appropriate segment of the public mind as those of the adopter of the mark."[11] *New England Duplicating Co. v. Mendes,* 190 F.2d 415, 418 (1st Cir. 1951).

Plaintiffs present the following evidence to demonstrate their usage of the mark prior to August 3, 1998:[12] (1) the posting of their webpages, (2) their participation in the link exchanges, and (3) Burns' attempts to direct traffic to their websites by securing prominent placement on well-known search engines. None of these actions, however, individually or collectively, was sufficient to create ownership rights in the "SureStream" mark.

Plaintiffs posted their webpages no earlier than twenty days before RealNetworks filed its intent-to-use application. However, Burns testified that when the webpages first went "live" no one viewed them or knew they existed (Burns Dep., Defs.' Mot. for Summ. J. Exh. 5 at 69). Although Burns attempted to rectify this by securing better placement of the websites on the search engines, he was unsuccessful because of the inundation by Real-Networks into the market (*id.*). Not only is there a complete absence of evidence of visitors to Plaintiffs' site, where they could

begin to associate the SureStream name with the services provided by SureStream, Inc., but also the evidence indicates that any actions taken by Burns to rectify this situation were (1) unsuccessful and (2) irrelevant to the prior use inquiry because they occurred sometime after September 1998,[13] at least a month or more after RealNetworks filed their intent-to-use application. In short, there is a complete absence of evidence that on August 3, 1998, any members of the general public knew that SureStream, Inc. existed much less associated the "SureStream" mark with its services.

Similarly, although Plaintiffs have presented evidence that they hosted links for several stock market sites on their website prior to August 3, 1998, they have not presented any evidence that the SureStream sites were advertised in return. Even assuming that a link to their websites appeared on someone else's site, Plaintiffs have not presented any evidence that this "advertising" or "promotion" was of "such nature and extent as to create an association of the ... services and the mark with the user thereof." *New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1200 (9th Cir.1979); *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1274 (2d Cir.1974) (holding that, a minimum, the party claiming trademark rights must have participated in an "active and public attempt" to

---

ciently public; and (3) whether the use was consistent and continuous. *Allard Enters., Inc. v. Advanced Programming Res., Inc.,* 146 F.3d 350, 359 (6th Cir.1998). Although the Court is persuaded that the less-restrictive approach by the *Allard* court is more consistent with the common-law standard of "use," *see* Judge Ackerman's dissenting opinion in *Lucent,* 186 F.3d at 319–20, it makes no difference which test is applied in this case because Plaintiffs could not meet either test.

11. This requirement is consistent with the statutory definition of "service mark," which

is: "any word, name, symbol, or device, or any combination thereof ... used by a person ... to identify and distinguish the services of one person ... from the services of others and to indicate the source of the services." 15 U.S.C. § 1127.

12. Because the inquiry is whether Plaintiffs "used" the mark *prior* to August 3, 1998, any actions taken by Plaintiffs after this date are not relevant.

13. RealNetworks released their software in September 1998.

establish the associated trade of goods or service). The advertising was strictly passive and not directed at any particular audience. Considering the totality of the circumstances, *see Windows User, Inc. v. Reed Bus. Pub. Ltd.*, 795 F.Supp. 103, 108 (S.D.N.Y.1992), the Court concludes that Plaintiffs' activities did not constitute a "use in commerce" sufficiently public to create ownership rights in the "SureStream" mark. *See Momentum Luggage & Leisure Bags v. Jansport, Inc.*, No. 00 CIV. 7909(DLC), 2001 WL 830667 *6 (S.D.N.Y. July 23, 2001) (finding that the party's one paid advertisement, two mentions in trade journals, and one appearance at a trade show was insufficient commercial promotion to create common-law trademark rights); *cf. Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1196 (11th Cir.2001) (widespread distribution to targeted public of software product samples sufficiently identified with mark together with evidence that public associated the mark with the software product sufficient even absent actual sales); *New West*, 595 F.2d at 1200 (promotions of magazine with mark on cover distributed to thousands of potential readers coupled with advertisement and distributor solicitations sufficient to create common-law trademark rights).

Because the Court finds that Plaintiffs did not have ownership rights in the "SureStream" mark before RealNetworks filed their intent-to-use application, it is unnecessary to address RealNetworks' remaining arguments.[14] RealNetworks is entitled to summary judgment on Plaintiffs' federal and state trademark infringement claims.

**B. RealNetworks' Trademark Infringement Counterclaims**

■ RealNetworks has filed a Motion to Dismiss its counterclaims against Plaintiffs and SureStream, Inc. RealNetworks asks the Court to dismiss these claims without prejudice to refiling. Plaintiffs and SureStream, Inc., object to the claims being dismissed without prejudice and ask the Court to either address the arguments they raised in their motion for summary judgment or dismiss RealNetworks' claim *with* prejudice.

Rule 41(a)(2) of the Federal Rules of Civil Procedure permits the Court to dismiss an action "upon such terms and conditions as [it] deems proper." However, key to the Court's decision is whether Plaintiffs and SureStream, Inc., will suffer "legal prejudice." *Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 357–58 (10th Cir.1996). To determine this, the Court reviews the non-exhaustive list of factors set out in *Phillips:* (1) the opposing party's effort and expense in preparing for trial; (2) any excessive delay or lack of diligence by the moving party; (3) the adequacy of reasons given for dismissal; (4) the current stage of litigation; and (5) any duplicative expenses the opposing party may face in a second trial.

Counterclaim Defendants argue that RealNetworks is attempting to avoid an adverse decision on its trademark infringement claims by seeking dismissal without prejudice. RealNetworks insists that it seeks to dismiss the damage claims against the Counterclaim Defendants because it learned through discovery that they have never made any money through their web-

---

**14.** RealNetworks also argued that Plaintiffs could not demonstrate that their mark was likely to cause confusion with that used by RealNetworks and that Plaintiffs are not the proper parties in interest because of an inval-

id attempt to assign the "SureStream" mark apart from its goodwill. Additionally, RealNetworks argued that it is entitled to partial summary judgment on the issue of whether Plaintiffs are entitled to any money damages.

sites. Thus, according to RealNetworks, the claims for damages are "unnecessary."

Although Counterclaim Defendants have filed a motion for summary judgment, RealNetworks is not using dismissal to avoid this motion. Indeed, it appears that even if Counterclaim Defendants' laches argument was a viable affirmative defense,[15] it would likely bar only the recovery of any profits from Counterclaim Defendants and would not preclude other forms of relief.[16] *See Golden West Brewing Co. v. Milonas & Sons,* 104 F.2d 880, 882 (9th Cir.1939); *Field Enters. Educ. Corp. v. Cove Indus., Inc.,* 297 F.Supp. 989, 996–97 (E.D.N.Y.1969). Rather, Defendant is making the strategic decision not to expend additional resources on a trial against Plaintiffs and SureStream, Inc., when these parties have not profited from their alleged infringement. Accordingly, it is agreeable to dismissing both its claims for damages and injunctive relief, provided the dismissal is without prejudice.

Further, there is no evidence that RealNetworks delayed in filing its Motion to Dismiss. RealNetworks apparently learned through discovery that Burns, Cole, and SureStream, Inc., did not profit from their use of the "SureStream" mark. Thus, any expenses incurred by Counterclaim Defendants attributable to the Counterclaim were necessary to bring the parties to this point.

Finally, the Court notes that the likelihood of a second trial rests primarily in the hands of Counterclaim Defendants. The Court has concluded that RealNetworks is the owner of the "SureStream"

mark. RealNetworks has indicated that, so long as Counterclaim Defendants do not proceed to infringe the mark, it does not intend to re-file this action (*see* Def.'s Mot. to Dismiss, Dkt. No. 83, at 2). Thus, the odds for facing a second suit will be determined by the decisions made by Counterclaim Defendants.

Quite simply, the equitable considerations weigh in favor of dismissal. Accordingly, Defendant's Motion to Dismiss without prejudice is granted.

### CONCLUSION

For the reasons stated above, Plaintiffs and Counterclaim Defendants' Motion for Summary Judgment (Dkt. No. 71) is DENIED. RealNetworks' Motion for Summary Judgment (Dkt. No. 74) is GRANTED. RealNetworks' Motion to Dismiss Without Prejudice (Dkt. No. 83) is GRANTED. All other pending motions are STRICKEN as MOOT. RealNetworks' counterclaims against Burns, Cole, and SureStream, Inc., are DISMISSED without prejudice. RealNetworks is entitled to judgment on Plaintiffs' claims and a separate judgment will be entered accordingly.

---

15. The Court declines to specifically address Counterclaim Defendants' laches arguments on the merits in the absence of a response by RealNetworks, but rather is noting that in the cases cited for support by Counterclaim Defendants, the laches defense did not bar the entire action, only certain forms of relief.

16. Additionally, the Court notes that these defenses would still be available in a second suit, should RealNetworks ever re-file its claim.